### UNITED STATES of America

v.

### ECHEVERRI, Elkin A., Appellant.

No. 87–5433.

United States Court of Appeals,
Third Circuit.

Argued May 3, 1988.
Decided Aug. 11, 1988.

Donald V. Morano (argued), Chicago, Ill., for appellant.

Samuel A. Alito, Jr., U.S. Atty., John P. Lacey (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before HIGGINBOTHAM, STAPLETON and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellant Elkin Echeverri was convicted on five drug-related charges after a three-month trial that involved seven other defendants. Echeverri contends that his convictions cannot stand because (1) the district court failed to give a requested instruction to the jury concerning the need for unanimous agreement on the acts that constituted a "continuing series" of narcotics violations for purposes of the Continuing Criminal Enterprise ("CCE") count, (2) the district court on two occasions erroneously admitted evidence of other, uncharged, criminal conduct, and (3) the RICO predicate acts found by the jury do not constitute a pattern as a matter of law.

I.

In reviewing Echeverri's convictions, we are required to view the evidence in the light most favorable to the government.

*See, e.g., Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Our discussion of the facts reflects this obligation.

Echeverri immigrated from Colombia to the United States in 1969. In 1977, he established a substantial drug distribution business having its headquarters in Elizabeth, New Jersey, at the North Cross Towers apartments. Elkin and his brother Edgar lived in the same building at North Cross Towers, the records of the business were kept there, drugs were stored there, and many drug transactions occurred there. The Echeverri organization operated in five states, New Jersey, California, Florida, Texas, and Colorado.

Echeverri's organization flourished from 1977 until Elkin Echeverri's brother Edgar was murdered in New York in 1982. Investigation of the murder led law enforcement authorities to Edgar Echeverri's apartment at North Cross Towers. There they discovered drugs, drug paraphernalia, $45,000 in cash, and notebooks containing records of a substantial drug distribution business that made frequent references to "Elkin".[1] Thereafter, the drug operation was conducted at a reduced level until August of 1984.

James Scheidemann was the superintendent at North Cross Towers and was the conduit through which most of the New Jersey transactions described in the indictment passed. James Scheidemann was also the operator of P.S. Mailers, a legitimate business involved in the preparation of postal mailings but which also served as a storage area for cocaine sent to New Jersey from Colombia or Miami.

Ronald Scheidemann, James's brother, and Ronald's wife Kathleen were major distributors of the cocaine imported by the organization over the course of the conspiracy. Ronald Scheidemann's associates included Dennis and Susan Commorato, of Dallas, Texas, to whom he supplied cocaine and quaaludes.

Jairo Garcia came to the United States with Edgar Echeverri and served Edgar and Elkin as a courier making runs between Miami and New Jersey with either cocaine or money. Julio Torres–Gomez, the uncle of James and Ronald Scheidemann, also served as a courier. On one occasion he transported several kilograms of cocaine from Miami to New Jersey and was paid $5,000 for the trip.

At trial, the government relied heavily on testimony elicited from four unindicted co-conspirators who had received immunity or other benefits. The first of these witnesses, Mario Alvarez, testified that he had encountered Elkin Echeverri during a trip to Miami in 1976, one year before the commencement of the charged conspiracy, at a house where both had gone to purchase substantial quantities of cocaine for distribution. Alvarez testified, over Echeverri's objection, that Echeverri was preparing at that time to start his own drug organization, having become dissatisfied with the "Valencia" organization for which he had been working. In particular, Alvarez testified that Echeverri was seeking to establish an arrangement with the cocaine source pursuant to which he could purchase cocaine on credit to be sold on his own account, and that Echeverri offered Alvarez and other associates in the Valencia organization positions in his new organization. Finally, Alvarez testified that in three transactions with Echeverri in 1979, he purchased quantities of cocaine ranging from approximately one-half kilograms to three kilograms and paid from $20,000 to $120,000.

Kathleen Scheidemann, Ronald Scheidemann's wife, testified at length about the narcotics transactions that she and her husband had participated in on behalf of the Echeverri organization, including one involving the receipt of a kilogram of cocaine that had been delivered to Echeverri and several of his codefendants in spring of

---

**1.** The records document drug transactions occurring between August 1981 and May 1982 involving 32 kilograms (approximately 70 lbs.) of cocaine, representing gross revenues of nearly $2 million.

1982. She testified that during the time she resided with her husband, cocaine and quaaludes were stored at her apartment in Springfield, New Jersey. On one occasion, her husband showed her a black case in which several kilograms of cocaine and $260,000 were stored. She also testified to seeing quantities of cocaine stored in the basement of North Cross Towers and observing five football size shipments of cocaine being delivered to P.S. Mailers in Morristown, New Jersey. She further testified about trips to Florida that she and Ron had made in 1981 and 1982. On two occasions, the couple transported cocaine from Florida to New Jersey.

Juan Castro described the "California branch" of the Echeverri organization. Castro testified that he had been introduced to Echeverri by a mutual acquaintance, and that he had rented two apartments for Echeverri in Los Angeles, one used for living quarters and the other for storage of cocaine. According to Castro, he had made monthly flights between Florida and Los Angeles for Echeverri over a period of more than a year, each time ferrying from four to six kilograms of cocaine to Los Angeles and returning to Miami with money in amounts ranging from $60,-000 to $485,000.

Finally, a fourth co-conspirator, Stanley Buglione, testified concerning three drug purchases he made from James Scheidemann at P.S. Mailers. He also testified about an incident involving Edgar Echeverri's apartment at North Cross Towers. Following Edgar's death, Elkin and James paid Buglione $2,000 to break into Edgar's apartment to retrieve documents and drug paraphernalia, as well as personal items belonging to Elkin. Elkin drew Buglione a diagram designating where everything that he wanted was located, and Buglione broke into the apartment and removed the specified items.

Echeverri took the stand in his defense and testified that he knew his brother was a cocaine dealer, that he himself had never been involved with drugs, and that the "Elkin" referred to in Edgar's notebook was someone else. He indicated that he had been in the business of buying and selling clothes, cosmetics, and electronic appliances. His purchasing caused him to travel about the country and he regularly exported and imported goods to and from Colombia. He admitted that, with one exception, he knew the alleged co-conspirators, but denied being in a drug business with them. Finally, he admitted having hired Buglione to break into Edgar's apartment but denied that he had asked him to retrieve drug paraphernalia.

In rebuttal, the government tendered testimony concerning a February 1986 search of a Los Angeles apartment leased to Echeverri. Over Echeverri's objection, the district court permitted Officer David Dick to testify that the searching officers found four kilos of cocaine and personal papers addressed to Echeverri and his girlfriend Rosa Cobb, both in their own names and in the alleged aliases "Anthony Razzeti" and "Patricia Cariolli."

The jury convicted all but one of the defendants on one or more counts.[2] Echeverri was convicted of (1) a Racketeer Influenced and Corrupt Organization (RICO) conspiracy; (2) a substantive RICO offense, in violation of 18 U.S.C. §§ 1962(c) and 1962(d); (3) operating a Continuing Criminal Enterprise ("CCE") between January, 1977 and August, 1984 contrary to 21 U.S.C. § 848 ("kingpin" statute); (4) conspiracy in violation of the federal drug laws, as prohibited by 21 U.S.C. § 846; and (5) possession of cocaine with intent to distribute, as prohibited by 21 U.S.C. § 841(a)(1). Echeverri's post-trial challenges to these convictions in the district court were rejected.

Echeverri was sentenced on the CCE conviction to a 25–year term, without parole or probation, and a $25,000 fine. He was sentenced to a term of 20 years and a $25,000 fine on each of the RICO counts, and to 15 years and a $25,000 fine on each of the drug conspiracy and possession counts. All other sentences were made to

2. Susan Commorato was acquitted of the only charge for which she was tried.

run concurrently with his 25–year CCE sentence.[3]

## II.

■ In support of the CCE count, the government offered testimony concerning a plethora of drug-related activity.[4] At the conclusion of the evidence, Echeverri argued that there could be no conviction on this count unless the members of the jury reached unanimous agreement on each drug offense that they believed had occurred and had constituted a "continuing series" of violations of the federal narcotics laws. In order to assure that the jury would not return a verdict of guilty without such unanimity, Echeverri requested the following jury instruction:

> The second element the government must prove beyond a reasonable doubt is that this offense was part of a continuing series of violations of the federal narcotics laws. A continuing series of violations is three or more violations of the federal narcotics laws committed over a definite period of time.
>
> You must unanimously agree on which three acts constitute the continuing series of violations.

App. at 3597. Echeverri maintains that the district court committed reversible error by failing to adopt this or a similar charge, despite his request. We agree.

Our conclusion is compelled by the recent decision in *United States v. Beros*, 833 F.2d 455 (3d Cir.1987), where this court addressed a similar unanimity issue. In *Beros*, the defendant, a union officer, was convicted on several counts of misusing union funds. Counts 3 and 5, among others, charged the defendant with "willfully and unlawfully embezzling, stealing, ab-

stracting and converting to his own use the moneys, funds, assets and other property of the Teamsters Joint Council 40." 833 F.2d at 459. The district court correctly charged the jurors that they were required to agree unanimously with respect to which " 'method, mode, or manner of violating the law occurred,' " *id.*, i.e., whether the defendant embezzled, stole, abstracted or converted.

The district court in *Beros* refused, however, to instruct the jurors that they must reach unanimous agreement concerning which acts by the defendant they deemed to constitute the embezzlement, stealing, abstraction, or conversion. With respect to Count 3, for example, the government contended that the defendant had:

> (1) used a Joint Council credit card to pay airfare for himself and his wife; (2) occupied a hotel suite that cost $160 per day, rather than a single or double room which would have cost no more than $60 per day; and (3) remained in Florida for personal reasons after the conclusion of the conference, but continued to expend union funds.

833 F.2d at 458. In the absence of a specific unanimity instruction directed to the government's several claims, it was apparent that the jury need not have unanimously agreed that any particular criminal act had been committed by the defendant. We found that a "significant potential existed for the jury to misunderstand its obligation," *id.*, and reversed. We held that:

> Given the range of possibilities by which the jury could have reached its verdict, and the possibility that individual jurors reasonably could have disagreed as to which act supported guilt, it was necessary that the district court in this case

---

3. Echeverri also contends that the district court should not have permitted convictions and sentences on both the Continuing Criminal Enterprise and the charge of conspiracy in violation of 21 U.S.C. § 846. Were this contention not mooted by our resolution of the appeal, the proper procedure would before this court to instruct the district court to vacate the conspiracy sentence and to impose a general sentence covering both convictions. *See United States v. Aguilar*, 843 F.2d 735 (3d Cir.1988).

4. We agree with the government that it was entitled to rely upon all of this activity, whether or not referred to in the indictment, in arguing to the jury that a series of narcotics violations had occurred. *See, e.g., United States v. Sterling*, 742 F.2d 521 (9th Cir.1984), *cert. denied* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); *Sperling v. United States*, 692 F.2d 223 (2d Cir.1982), *cert. denied* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

clearly instruct the jury regarding the required unanimity of its verdict.

*Id.*

We find this case indistinguishable. Here, the jury was instructed that the continuing series element required them to find three violations of drug laws, *see U.S. v. Young*, 745 F.2d 733, 747 (2d Cir.1984) (continuing series means three drug-related criminal offenses) (citing cases), yet as a result of the district court's refusal to give the requested instruction, there is no assurance that the jury unanimously agreed that the same three narcotics violations occurred. In this context, we find, as we did in *Beros*, that the district court failed to ensure that the "jurors [would] be in substantial agreement as to just what [happened] as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson*, 553 F.2d 453, 457–58 (5th Cir.1977).

The government nevertheless contends that, because the statute on its face does not specify that a continuing series means three violations of narcotics laws, but rather the requirement resulted from judicial interpretation of the statute, the jury need not be unanimous as to the three offenses committed by the purported kingpin. We are unpersuaded. A defendant is entitled to have the court insist on unanimous agreement as to all essential elements of the crime charged. We see no rational basis for distinguishing between essential elements appearing on the face of the statute and those that have been judicially recognized based on statutory interpretation; in either case, congressional intent is the touchstone.

The government also suggests that the district court's general unanimity charge, coupled with instructions given with respect to other counts, provides satisfactory assurance of the requisite unanimity. We disagree. The usual rule that a general unanimity instruction is sufficient gives way "where the complexity of the case, or other factors, creates the potential that the jury will be confused." *Beros*, 833 F.2d at 460. In this case the "complexity ... [and] other factors" are obvious. First, as

Echeverri stresses, there was evidence tending to show numerous alleged violations, any three of which could have been the focus of a particular juror. Since the indictment did not specify the violations that allegedly constituted the "continuing series," it offered no aid in focusing the jury's attention on particular violations. Moreover, with respect to the RICO count, a count analogous to the CCE count in question here, the district court gave a careful unanimity instruction regarding the predicate acts and issued special verdict forms which required the jury to designate the specific predicate acts upon which they had unanimously agreed. The jury may well have reasonably inferred from the absence of similar instructions concerning the CCE charge that unanimity on the constituent elements of "continuing series" was unnecessary. Given the significant potential for jury confusion, we conclude that the general unanimity instruction was not sufficient in this context.

It follows that Echeverri's conviction on the CCE count cannot stand and that the case must be remanded to the district court for a new trial on that count. The remaining issue is whether Echeverri's other convictions must likewise fall.

### III.

Echeverri contends that the district court also committed reversible error by admitting the other crimes testimony provided by Mario Alvarez and Officer David Dick. Under Federal Rule of Evidence 404(b), evidence of other crimes or wrongful acts is admissible only if it is offered for a purpose other than to prove "the character of a person in order to show action in conformity therewith." Permissible purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Under Rule 403, evidence that meets the requirements of Rule 404(b) must nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." *See United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir.1988) (the Supreme Court's guidelines

for admissibility of other crimes evidence are that such evidence must have a proper purpose, be relevant, and have probative value outweighing its potential for unfair prejudice; in addition, the trial court must instruct the jury to consider such evidence only for the limited purpose for which it is admitted). Echeverri insists that the other crimes testimony of both Alvarez and Dick was offered solely to demonstrate bad character, and that the testimony was seriously prejudicial.

### A.

Echeverri's objection to the Alvarez testimony relates to Alvarez's account of his trip to Miami in 1976, one year before the start of the conspiracy alleged, to pick up five kilograms of cocaine. The district court was persuaded that the 1976 events in Miami about which Alvarez testified constituted preparation for the charged conspiracy. In light of this, the court admitted Alvarez's testimony for the stated purpose of providing "background" information. Echeverri maintains that the district court erred in so doing.

■ While courts have occasionally admitted prior crimes evidence as "background information,"[5] we agree with Echeverri that this label is uninformative at best and, at worst, can be an unacceptable substitute for the analysis required by Rule 404(b). In order to admit evidence under Rule 404(b), a court must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts. Once the chain of logic has been articulated, its probative strength must be weighed under Rule 403 against any potential for unfair prejudice. We believe this analysis can and should be conducted with more specificity than is ordinarily reflected in a terse reference to "background information."

In the specific context of this case, however, we think it apparent that the district court's description and treatment of Alvarez's testimony as "background information" reflected the logical conclusion that the jury could infer from that testimony that Echeverri had access to a source of large quantities of cocaine and was preparing to establish a large scale drug business. If the jury believed Alvarez's testimony that Echeverri knew a source of substantial quantities of cocaine and was attempting to enlist personnel and to establish a substantial line of credit with his source so he could sell drugs on his own behalf, those findings would make it substantially more likely that Echeverri subsequently initiated the charged conspiracy. Based on this analysis, we believe that Rule 404(b) authorized the admission of Alvarez's testimony.

We also agree with the district court that this evidence of preparation was highly probative of Echeverri's subsequent organization of, and participation in, the charged conspiracy, and we conclude that the district court properly determined that the probative value of the evidence outweighed the possibility of unfair prejudice from its admission. With respect to the potential for unfair prejudice, we note that the trial judge was sensitive to the fact that the jury might infer from the above-described probative evidence that Echeverri had been involved in criminal activity prior to Alvarez's trip to Miami. He specifically instructed the jury immediately after they heard Alvarez's testimony that "[c]rimes, if any, which may have been committed prior to this trip cannot be considered ... in any way, any manner, in establishing the guilt of any defendant in the present case." App. at 125. Given this instruction, and in light of the fact that the highly probative evidence regarding the 1976 Miami incident could not have been admitted in a way that would have further reduced the possibility of prejudice, we cannot fault the district court's handling of Alvarez's testimony.

---

5. *See, e.g., United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir.), *cert. denied* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 776 (1985); *United States v. Moten*, 564 F.2d 620, 628 (2d Cir.), *cert denied* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977).

## B.

We find more merit in Echeverri's objection to the district court's admission of testimony by Officer Dick concerning events occurring 18 months after the alleged conspiracy terminated. The district judge concluded that Officer Dick's description of the four kilos of cocaine and assorted personal papers discovered in Echeverri's apartment in 1986 was admissible to demonstrate intent, knowledge, and identity, and he so instructed the jury. We cannot agree with this conclusion.

The conscientious district judge issued a memorandum opinion explaining his reasons for admitting Officer Dick's testimony. He there expressed the view that wrongful acts occurring after the commission of a crime can be probative of knowledge and intent at the time of the crime, and he cited a number of cases that have so held. *See* cases collected in 2 *J. Weinstein & M. Berger, Weinstein's Evidence* §§ 404(12), 404(13) (1986). We do not dispute that there may be cases in which evidence of subsequent wrongful acts may properly be admitted under Rule 404(b). However, we find this case distinguishable from the precedents cited by the district court and indistinguishable from a precedent of this court.

In *United States v. Boyd*, 595 F.2d 120 (3d Cir.1978), the defendants were accused of having conspired to manufacture and distribute methamphetamine from July 24, 1975 to October 25, 1975. No overt act was alleged to have occurred in furtherance of the conspiracy later than September 29, 1975. During the trial, the government tendered and the court admitted testimony from an undercover agent that he had discussed a possible purchase of "P-2-P", a chemical used in the manufacture of methamphetamine, with two of the defendants on four separate occasions in December of 1975 and January of 1976. This testimony was admitted to prove intent, knowledge and a "common type of plan or scheme," and the district court instructed the jury that this testimony could be considered only for these purposes. We found

the admission of this testimony to be reversible error:

> [O]n this record [the agent's] testimony was other crimes evidence pure and simple. It was not materially different from an attempt to prove a robbery in August by evidence of an unrelated robbery in January. It was relevant only if the jury could have drawn the inference that the subsequent crime evidenced a prior propensity toward criminal activity, and that, of course, is the one inference that other crimes evidence may not be admitted to support.

595 F.2d at 127.

■ In this case, the presence of cocaine in Echeverri's Los Angeles apartment 18 months after the termination of the alleged conspiracy and four years after the last overt act of which there was direct evidence was clearly no more probative of the knowledge and intent of the alleged co-conspirators during the relevant period than were the drug negotiations in *Boyd*. Accordingly, we must conclude that the admission of Dick's testimony to prove knowledge and intent was error.

The third purpose for which the court admitted the testimony, to show identity, falls equally short of justifying the court's ruling. First, Officer Dick's description of the manner in which the cocaine had been packaged did not reveal the Echeverri organization's "signature" or trademark, as the government would have us conclude. Given that the record reflects only one other occasion when a packaging method even arguably similar was employed and that there is testimony as to numerous other forms of packaging, the government's argument that the organization typically packaged cocaine in one distinctive fashion is difficult to understand. *See United States v. Herman*, 589 F.2d 1191, 1198 (3d Cir.), *cert. denied* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979) (other crimes evidence inadmissible to show common scheme where modus operandi not particularly unusual or distinctive); *see also* 2 *J. Weinstein & M. Berger, Weinstein's Evidence* § 404[16] at 129–30 (1986) ("The question for the court is whether the char-

acteristics relied upon are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof.")

The government's second contention with respect to identity, that Officer Dick's testimony was admissible to prove that Echeverri actually was the "Elkin" referred to in his brother's drug records seized years earlier, is equally unpersuasive. Whatever meager probative value the testimony did have with respect to the identity of "Elkin," that value derived exclusively from the fact that Echeverri's involvement with drugs in 1986 increases the likelihood that he previously had participated in drug sales; such proof of bad character is exactly what Rule 404(b) is intended to preclude. Finally, the government's desire to demonstrate that Echeverri had used the alias "Anthony Razzeti" might have justified admission of the testimony concerning the papers discovered during the search, but it did not support admission of the evidence concerning cocaine.

Having concluded that the district court erred in admitting the Dick testimony concerning the four kilos of cocaine, we must inquire whether that error may be characterized as harmless. Error is harmless in this context only if "it is highly probable that the [other crimes] evidence ... did not contribute to the jury's judgment of conviction." *United States v. Schwartz*, 790 F.2d 1059, 1062 (3d Cir.1986), quoting from *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976). " 'High probability' requires that the court have a 'sure conviction that the error did not prejudice the defendant,' but need not disprove every 'reasonable possibility' of prejudice." *United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.), *cert. denied* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1986), quoting from *United States v. Jannotti*, 729 F.2d 213, 219–20 & n. 2 (3d Cir.), *cert. denied* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed. 2d 182 (1984). As this court has noted, when other crimes evidence is erroneously admitted the error will normally not be harmless. *See Toto*, 529 F.2d at 283. As in other cases, however, the "crucial thing is the impact of the thing done wrong on the minds of [the jury] ... *in the total setting.*" *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (emphasis supplied).

The government's co-conspirator witnesses testified at length and in detail about the operations of the Echeverri organization. Nevertheless, as we have indicated, each derived some benefit from his or her cooperation with the government, and if the testimony of these witnesses were all the government had been able to tender, there would be a significant possibility that the jury may have approached rebuttal harboring a reasonable doubt about guilt but thereafter may have been swayed by Dick's rebuttal testimony. This hypothetical is inapposite, however, because the jury was not required to reach a verdict based solely on the co-conspirators' accounts of Echeverri's drug operations and his denial of any involvement.

Instead, and fortunately for the government, the crucial aspects of the testimony of Alvarez, Kathleen Scheidemann, Castro, and Buglione were strongly corroborated by undisputable tangible evidence seized in the search of Edgar Echeverri's apartment. Based on that corroboration, we believe the evidence as a whole prior to rebuttal was so overwhelming that the jury could have entertained no reasonable doubt at that point about Echeverri's culpability on the charges of which he was convicted. As a result, we conclude that it was highly probable that Dick's testimony played no role in those convictions.

Following Edgar's death, a search of his apartment resulted in the seizure of a pound of cocaine, $45,000 in cash, a revolver, weighing scales, and other drug paraphernalia. Also found were Elkin Echeverri's checkbook, the keys to his apartment in the same building, and a credit card application in his name which listed his employer as P.S. Mailers and made no reference to clothes, electronic equipment, or the export or import of legal products. Most importantly, the searchers also found three notebooks documenting the operations of a drug business that grossed just under $2,000,000 between August of 1981 and May of 1982, the period covered by the

records. The jury was aided in understanding these records by the expert testimony of Special Agent William Mochler, but virtually all of the facts to which we hereafter refer are apparent to anyone reading these records. Moreover, although he denied any personal involvement, Echeverri did not dispute that these were records of a large cocaine distribution business and did not quarrel with any material portion of Mochler's interpretation of the records.[6]

One ledger book contains three sections: a section recording a series of cocaine transactions and the customers to whom sales were made, a section showing "loans" to various individuals, and a section allocating expenses to various "deals" or deliveries of cocaine from the business's supplies. This ledger provides strong corroboration of the co-conspirators's description of Echeverri's drug business. The expenses charged to the various deals corroborate, for one thing, that Miami was a primary source of the business's cocaine and that the business had a California branch. Among the entries allocating various expenses to "deal # 8" and to "deal # 9," for example, there are entries showing payment of the rent for an apartment in Miami. A line has been drawn through these entries and, in each instance, a note has been made at the bottom of the page. The note for "deal 8" reads, "the Miami apartment is paid with the California money," and the note for "deal 9," "Rent for the apartment in Miami is paid with California business."

The ledger also confirms that Jairo Garcia is a courier whose expenses for transportation to and from Miami were paid by the business. It also shows the involvement of "Rosa" and "Camilto," names by which defendants Cobb and Torres-Gomez were addressed.[7]

The heavy involvement of "Elkin" is also documented. "Elkin's" transportation expenses are charged to a "deal" on numerous occasions. It is also reported that "Elkin" "took in $93,000," that "Macho owes Elkin $20,000," and that "Elkin" received large "loans" from the business.

While Echeverri testified that the "Elkin" in the records was someone else, this testimony could not have raised a reasonable doubt in the minds of the jury given the undisputed facts that:

(1) Elkin Echeverri was Edgar's brother and knew virtually all of the alleged conspirators.

(2) Elkin Echeverri had an apartment in the building used as a headquarters by the drug distribution business reflected in the records and his personal effects were found in the apartment where the records were kept and drugs stored.

(3) In the winter of 1981–82, Elkin Echeverri's apartment rent was $422 per month (as contrasted with Edgar's rent of $535). In November 1981, December 1981, January 1982, and March 1982, the ledger charged apartment rent of $422 to various cocaine "deals."

(4) Elkin Echeverri is married to Mary Echeverri. The ledger contains a page entitled "Personal Loans" to "Elkin" in 1981 that shows three payments to "Mary" in addition to numerous payments to "Elkin."

(5) Elkin Echeverri engaged Buglione to retrieve items from Edgar's apartment after it had been secured following his death.

As we earlier noted, the tangible evidence seized in Edgar's apartment not only

---

6. On cross-examination of Mochler, Echeverri's counsel elicited (a) that he was not implicated in the records as a customer of the business or a source of its cocaine, (b) that Mochler did not know who had maintained the books or "what that person had in mind when they were preparing" them, and (3) that the expenses charged to "deal 10," when added together, total $2,600.53, an amount that does not correspond to any figure on the page showing those expenses (the figure shown on the sheet as a total is $2,551.53).

Although the defendants' closing arguments to the jury were not transcribed, the government's rebuttal reflects that counsel for Jairo Garcia informed the jury that he would not "insult your intelligence [by suggesting that] these weren't drug records."

7. The ledger also makes reference to a "Cachaquito." Edgar's address book, seized at the same time, gives two telephone numbers for "Cachaquito"; one is the number of P.S. Mailers and the other is the number of James Scheidemann's home.

corroborates the testimony of the government witnesses generally but it does so specifically with respect to their testimony concerning the elements of the crimes charged in the indictment. Thus, with respect to Counts 1, 2, and 4, the counts charging a substantive RICO violation, a RICO conspiracy, and a drug conspiracy, the drug records alone can fairly be said to establish (1) the existence of an enterprise in the form of an association of individuals including Edgar and Elkin Echeverri, Jairo Garcia, Julio Torres-Gomez, and others, organized for the purpose of profiting from the sale of large quantities of controlled substances in New Jersey and California, (2) the existence of that enterprise during the relevant period for a minimum of ten months plus the time necessary to reach the volume of sales reflected in the record, (3) the willful agreement of Edgar and Elkin, Garcia, Torrez-Gomez, and others to participate in the affairs of the enterprise in order to accomplish its purpose, and (4) the involvement of the enterprise during this period in a pattern of racketeering activity which included a conspiracy to knowingly and willfully possess and distribute multi-kilogram quantities of cocaine and the actual possession of cocaine with intent to distribute. With respect to the specific possession with intent to distribute alleged in Count 9, Kathleen Scheidemann's testimony that in April of 1982 Elkin and Edgar, Ronald and James Scheidemann, Garcia, and Torres-Gomez possessed in her apartment a package of cocaine "the size of a football," is substantially corroborated by the drug records' showing the existence in April of 1982 of a large and active drug distributing enterprise involving Edgar and Elkin, Garcia, Torres-Gomez, and others.

For the foregoing reasons, we conclude that the admission of the Dick testimony was harmless error with respect to Echeverri's convictions on Counts 1, 2, 4, and 9.

## IV.

After the jury had returned a unanimous guilty verdict against Echeverri on Count 1, the RICO substantive offense count, the district court asked the jury to return to the jury room and designate on a special verdict form which of the charged acts of racketeering they had unanimously found each defendant committed. With respect to Echeverri, the jury indicated that Echeverri had personally engaged in the conspiracy to possess and distribute controlled substances as alleged in Count 4 and that in April of 1982, he had possessed cocaine with intent to distribute as alleged in Count 9. Echeverri's final argument on appeal is that the conduct in which he was alleged to have engaged in these counts and of which the jury found him guilty does not constitute a pattern of racketeering activity as a matter of law. We are unpersuaded.

To satisfy RICO's pattern requirement, the government must prove that Echeverri committed at least two of the predicate offenses described in 18 U.S.C. § 1961(1) within the statutorily-specified ten-year period. *See United States v. Riccobene,* 709 F.2d 214, 226–27 (3d Cir.1983). Because we agree with the government and with the Court of Appeals for the Second Circuit that a conspiracy to possess and distribute controlled substances like the one alleged in Count 4 can constitute a predicate offense for purposes of establishing a pattern of racketeering activity under RICO, we conclude that the government has met this burden here. *See United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Ruggiero,* 726 F.2d 913, 918 (2d Cir.), *cert. denied* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed. 2d 60 (1984); *United States v. Benevento,* 836 F.2d 60, 72 (2d Cir.), *cert. denied* — U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

Section 1961(1)(D) of the RICO statute specifically provides that predicate acts may include "any offense *involving ...* the felonious manufacture, importation, receiving, concealment, *buying, selling, or otherwise dealing in narcotic* or other dangerous drugs, punishable *under any law* of the United States...." (emphasis supplied). This broad language, in contrast to that of §§ 1961(1)(B) and (C) which require that the predicate acts be indictable

under specifically enumerated sections of the criminal code, clearly indicates that conspiring to "buy[ ], sell[ ], or otherwise deal[ ]" in narcotics, as defendant Echeverri did here, falls within the ambit of § 1961(1)(D). *See also United States v. Manzella,* 782 F.2d 533, 537 (5th Cir.), *cert. denied* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986) (adopting reasoning of *Weisman* in finding that § 1961(1)(A)'s "involving" language includes conspiracies to commit enumerated offenses); *United States v. Licavoli,* 725 F.2d 1040, 1045–1046 (6th Cir.), *cert denied* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *Kronfeld v. First New Jersey National Bank,* 638 F.Supp. 1454, 1472–73 (D.N.J. 1986) (Section 1961(1)(D) applies to conspiracy to commit fraud in the sale of securities); *cf. United States v. Fernandez,* 822 F.2d 382, 387 (3d Cir.), *cert. denied* — U.S. ——, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987) (conspiracy violation may serve as predicate act under 21 U.S.C. § 848).

Echeverri contends that even if a conspiracy to possess and distribute controlled substances can constitute a predicate offense, the conduct alleged in Count 4 and that alleged in Count 9 lack sufficient continuity to establish a pattern. As we read RICO's legislative history in *Barticheck v. Fidelity Union Bank,* 832 F.2d 36, 40 (3d Cir.1987), however, the continuity requirement simply calls "for an inquiry into the extent of the racketeering activity." The relevant factors are "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of the victims, the number of the perpetrators, and the character of the unlawful activity." 832 F.2d at 39. Thus, if the facts of a particular case show "criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time," that activity has the kind of continuity contemplated by the pattern requirement. *Marshall–Silver Constr. Co. v. Mendel,* 835 F.2d 63, 66–67 (3d Cir.1987).

Applying these criteria here, we conclude that Echeverri's April 1982 possession of a football-sized delivery of cocaine with intent to distribute and the long-term conspiracy described in Count 4 with its numerous participants, staggering volume of narcotics trafficking, and countless potential victims constituted the paradigm of a RICO pattern.

### V.

We will affirm Echeverri's convictions on Counts 1, 2, 4, and 9. We will reverse his conviction on Count 3 and remand for further proceedings consistent with this opinion.