**UNITED STATES of America**

**v.**

**Jose ORTIZ**

**No. CRIM. A. 99–256.**

United States District Court,
E.D. Pennsylvania.

Oct. 26, 2000.

Dennis J. Cogan, Dennis J. Cogan & Associates, Phila., PA, Arthur R. Shuman, Wyndmoor, PA, Anthony J. Petrone, Dennis J. Cogan & Associates, Phila., PA, for Jose Ortiz a/k/a Chelo, Defendant.

Gregory Paw, U.S. Attorney's Office, Phila., PA, for U.S.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

Defendant Jose Ortiz, a/k/a "Chelo," ("Ortiz" or "defendant") was charged in two counts of a superseding indictment with conspiracy to distribute and possess with intent to distribute cocaine base ("crack") and heroin in violation of 21 U.S.C. § 846 (Count One); and with possession with intent to distribute and aiding and abetting possession with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Three). On December 20, 1999, after a jury trial, Ortiz was found guilty of those charges. Presently before the Court is Ortiz's Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33. For the following reasons, the motion for new trial will be denied.

## II. BACKGROUND

Count One of the First Superseding Indictment ("Indictment") charged Ortiz with conspiracy to distribute and possess with intent to distribute cocaine base ("crack") and heroin. In describing the manner and means of the conspiracy in the Indictment, the government stated that Ortiz controlled an illegal drug distribution organization on the 3000 block of North Lee Street in Philadelphia, Pennsylvania. The Indictment charges that the conspiracy existed from "at least December 1996 through at least on or about August 12, 1998." Indictment ¶ 1.

In support of the conspiracy charge, the government offered in evidence a notebook of drug transactions through the testimony of Fermin Diaz–Baez ("Diaz–Baez" [1]). The notebook, Government Exhibit 17 ("G–17"), contains references to an individual named "Chelo," a name used by Ortiz. Ortiz objected to this evidence on the grounds that the evidence was inadmissible under Federal Rules of Evidence 404(b) and 403, and that the entries in the notebook constituted inadmissible hearsay. To resolve concerns about the admissibility of the evidence, the Court conducted a lengthy document voir dire out of the presence of the jury on December 8 and 9, 1999. After hearing the evidence, the Court ruled that G–17 was admissible.

Ortiz's motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is based on arguments that: (1) the evidence in the notebook was irrelevant to the charges against him and highly prejudicial; and (2) the entries relating to Chelo in the notebook constituted inadmissible hearsay not covered by any exception to the hearsay rule.

## III. STANDARD OF REVIEW

 Under Rule 33 of the Federal Rules of Criminal Procedure, the Court may grant defendant's motion for a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. "Whether to grant a Rule 33 motion lies within the district court's sound discretion." *United States v. Polidoro*, 1998 WL 634921, at *4 (E.D.Pa. Sept. 16, 1998) (citing *United States v. Mastro*, 570 F.Supp. 1388, 1390 (E.D.Pa. 1983)). In exercising its discretion, the court may grant a motion for a new trial on one of two grounds. First, the court may grant the motion "if, after weighing the evidence, it determines that there has been a miscarriage of justice." *Government of the Virgin Islands v. Commissiong*, 706 F.Supp. 1172, 1184 (D.Vi.1989). Second, the court "must grant a new trial if trial error had a substantial influence on the verdict." *Id.* at 1184; *see also Government of the Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir.1982) ("The reviewing court must decide whether the error itself had substantial influence [on the minds of the jury.]" (alteration in original) (internal quotations omitted)).

## IV. DISCUSSION

Ortiz argues that the erroneous admission in evidence of G–17, a notebook that contained records of drug transactions, had a substantial impact on the minds of the jury and contributed to his conviction. The Court concludes that the evidence was properly admitted and that there was no miscarriage of justice. The Court will address the issues raised–the relevance issue and the hearsay objections–in turn.

A. Relevance–Admissibility of G–17 Under Rules 404(b), 403, 402 and 401

Under Rule 402, "[a]ll relevant evidence is admissible" except as otherwise provided by the Constitution, federal law or the Federal Rules of Evidence. Fed.R.Evid. 402. "[E]vidence is 'relevant' if its existence simply has some 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Fed. R.Evid. 401." *United States v. Murray*, 103 F.3d 310, 316 (3d Cir.1997).

---

**1.** There is some discrepancy as to the last name of this witness. Ortiz refers to Fermin Diaz–Baez as "Baez–Diaz" throughout his memorandum of law in support of a new trial; the government refers to him as "Diaz– Baez." For the purposes of this memorandum, this witness will be referred to as "Diaz–Baez," the name by which he introduced himself at trial. *See* Tr. at 2 (Dec. 8, 1999).

Rule 404(b) restricts the admission of evidence of other crimes or acts. It provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

The government presented evidence that Ortiz was the "owner" of the 3000 block of North Lee Street in Philadelphia—others would pay him "rent" to distribute drugs on the block. Specifically, coconspirators of Ortiz testified that two individuals, Cesar Vasquez, a/k/a "Tico," ("Vasquez" or "Tico") and Gustavo Fernandez ("Fernandez" or "Gustavo") rented the block from Ortiz and prepared and distributed illegal drugs on the block.[2]

According to Diaz–Baez's testimony during the document voir dire, the entries regarding "Chelo," a name used by Ortiz, were made on January 15, 1996.[3] Tr. at 30 (Dec. 9, 1999). Because the entries were made on January 15, 1996, Ortiz argues that the entries were beyond the temporal limits of the conspiracy charged in the Indictment–from "at least December 1996"–and were thus irrelevant and highly prejudicial evidence of crimes not charged. Indictment ¶ 1. As such, Ortiz contends that the admission of the evidence contained in G–17 constituted "other crimes" evidence in violation of Fed.R.Evid. 404(b).[4]

---

**2.** For example, Ippifano Gonzales testified that "Cello [sic] was ... the owner of the block; not only for the heroin, but also for the cocaine. He was the one that managed all of them.... Cello [sic] had given the block to Gustavo and Tico for them to sell the drug. They had agreed to pay ... a rent to Cello [sic]." Tr. at 48–49 (Dec. 7, 1999). Further, Diaz–Baez testified that Tico, one of the members of the conspiracy, had told him that he had a drug corner and "the owner of the corner's name was Chelo." Tr. at 50 (Dec. 9, 1999) (testimony of Diaz–Baez)

In addition, other witnesses testified as to other aspects of Chelo's involvement with the drug distribution organization. Johanna Guzman testified to holding heroin that Chelo gave her for distribution from her home at 3033 Lee Street, Tr at 3, 9–10 (Dec. 13, 1999). Carmen Guzman testified that a drug distributor named Jose had informed her that Chelo was the "boss" of the drug business, Tr. at 175 (Dec. 13, 1999); and that Chelo would "usually pass through" the 3000 block of Lee Street, *id.* at 186, where she lived and worked as a "caseworker." *Id.* at 177. On December 7, 1999, Ippifano Gonzales testified that

the drugs he prepared while in the employ of Gustavo and Tico were distributed on Lee Street, Tr. at 39 (Dec. 7, 1999). *See also* Tr. at 10, 11, 14, 15, 17, 18, 40, 41, 48–51, 54–56 (Dec. 7, 1999) (testimony of Ippifano Gonzales); Tr. at 17, 18, 25, 26 (Dec. 9, 1999) (testimony of Antonio Duran); Tr. at 71 (Dec. 9, 1999) (testimony of Diaz–Baez).

**3.** The government does not concede that the entries regarding Chelo were made in January 1996; it suggests that some of the references in Exhibit 17 relate to balances in Exhibit 18, which was prepared in mid–1997. *See* Government's Opp'n to Mot. of Def. Jose Ortiz for a New Trial, at 5. The Court concludes that the only evidence of the date of the Chelo entries was that provided by Diaz–Baez–January 15, 1996.

**4.** The government replies to this argument with a discussion of whether a variance occurred between the Indictment and the proof offered at trial. Ortiz does not contend that a variance occurred. Rather, he claims that the evidence relating to drug transactions that occurred in January 1996 was not relevant to

**448**

Relying on a recent Third Circuit case, *United States v. Akande*, 200 F.3d 136, 137 (3d Cir.1999), Ortiz argues that conduct may not be considered when it falls far outside the "temporal limits" of the conspiracy as charged. In *Akande*, the Third Circuit addressed the narrow question of how to determine the scope of an order of restitution. *See id.* at 137. Because restitution may only be ordered pursuant to statutory authorization, which limits permissible restitution to compensate for the harm resulting from the "offense of conviction," the *Akande* court examined which criminal acts undertaken in the course of a conspiracy could be properly included as part of the conviction of that crime. *Id.* at 138–39. The Third Circuit held that dates set forth in an indictment must be strictly construed for restitution purposes and allowed restitution only for crimes committed during the charged period of the conspiracy. Significantly, the court expressly distinguished between challenges to a restitution order under the restitution statute and "attacks on the sufficiency of the evidence or indictment." *Id.* at 142. This Court is unwilling to extend the *Akande* rationale to a case challenging the admissibility of evidence of a conspiracy.

At trial, the Court determined that the evidence contained in the notebook was intrinsic evidence of the conspiracy itself, not 'other crimes' evidence. As the Third Circuit has explained, "[w]hen the evidence of another crime is necessary to establish an element of the offense being tried, there is no 'other crime.'" *United States v. Sriyuth*, 98 F.3d 739, 747 (3d Cir.1996)

(internal quotation omitted). In this case, the evidence of interaction between Ortiz and the other members of the Diaz–Baez drug organization was relevant to prove the existence of the conspiracy and the defendant's relationship to the drug distribution organization that provided drugs to the 3000 block of North Lee Street. The entries regarding a purchase of drugs by "Chelo" (Ortiz) in early 1996 tend to establish that Ortiz was a member of the conspiracy; they were not admitted to show his propensity to commit drug-related crimes. After making the determination of relevancy, the Court concluded at trial pursuant to Rule 403 that the probative value of the evidence outweighed the danger of unfair prejudice.[5]

Assuming *arguendo* that the notebook entries did not properly constitute intrinsic evidence, under certain circumstances, courts may permit the introduction of other crimes evidence as relevant background information regarding the development and existence of a charged conspiracy. In *United States v. Echeverri*, 854 F.2d 638, 644 (3d Cir.1988), for example, the Third Circuit upheld the district court's admission of evidence relating to the defendant's purchase of cocaine one year before the start of the conspiracy charged as evidence of preparation to establish a large drug business. In so doing, the *Echeverri* court ruled that "[i]n order to admit evidence under Rule 404(b), a court must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must in-

the crime charged and that it constituted improper "other crimes" evidence, offered "to prove the character of a person in order to show action in conformity therewith." Fed. R.Evid. 404(b).

5. The Court stated on the record: "[M]y 403 determination with respect to G–17 is the

same as the 403 determination I made at sidebar with respect to G–18." Tr. at 68 (Dec. 9, 1999). During the earlier sidebar ruling, the Court ruled that the probative value of the evidence in both G–17 and G–18 "outweighs the nature [danger] of untoward [unfair] prejudice." *Id.* at 64.

clude no link involving an inference that a bad person is disposed to do bad acts." *Id.*

As discussed above, the reference to "Chelo" in G–17 tends to establish the existence of a relationship between members of the conspiracy, a material fact at issue. Thus, the evidence was admissible under 404(b). *See* Fed.R.Evid. 404(b). Once logical relevance of Rule 404(b) evidence is established, the court must weigh the probative value of the evidence against any potential for unfair prejudice under Rule 403. *See* Fed.R.Evid. 403. On this issue, the Court determined at trial that the probative value of the evidence outweighed the danger of unfair prejudice when ruling that the evidence was intrinsic and relevant to the proof of the conspiracy.

### B. Hearsay Objections to the Admissibility of G–17

The Court next turns to defendant's objection that G–17 constitutes inadmissible hearsay evidence. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Hearsay is generally inadmissible, unless an exception to the rule against hearsay is applicable. *See* Fed.R.Evid. 802. In this case, G–17 was properly admitted either as a coconspirator statement under Rule 801(d)(2)(E) or a business record under Rule 803(6).

#### 1. Rule 801(d)(2)(E)

■ For hearsay statements to be admissible under Rule 801(d)(2)(E),[6] the district court must find by a preponderance of the evidence "(1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. McGlory,* 968 F.2d 309, 333 (3d Cir.1992) (citing *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)).

■ Before allowing the admission of a statement made by a coconspirator, the party seeking to introduce the evidence must establish the existence of a conspiracy by a preponderance of the evidence. *See id.; Bourjaily v. United States,* 483 U.S. at 175, 107 S.Ct. at 2778. Under Rule 801(d)(2) the "contents of the statement shall be considered but are not alone sufficient to establish ... the existence of a conspiracy...." Fed.R.Evid. 801(d)(2). A court may thus consider the contents of the declarant's statement in determining whether a conspiracy existed. *Bourjaily,* 483 U.S. at 179–80, 107 S.Ct. at 2780–81.

■ The government established by physical evidence[7] and the testimony of Diaz–Baez and several coconspirators that he and others were engaged in a conspiracy to distribute drugs. Diaz–Baez testified as to how he supplied heroin to the drug distribution operation. *See* Tr. at 2–5 (testimony of Diaz–Baez) (Dec. 8, 1999). Others testified as to their work as sellers, "caseworkers," packagers of drugs, and couriers of drugs and money in the organization that distributed drugs to the 3000

---

**6.** Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy" is not hearsay. Fed.R.Evid. 801(d)(2)(E)

**7.** For example, the government introduced heroin, Tr. at 26 (Dec. 7, 1999); a grinder used in the preparation of drugs, *id.* at 28; a drug scale, *id.;* a spoon and mask used in the preparation of heroin, *id.* at 29; blue bags used for packaging heroin, *id.;* a stamp used to mark the blue bags in which the drugs were packaged, *id.;* and a machine used to seal plastic bags during drug packaging, *id.* at 29–30.

block of North Lee Street. *See supra* note 2. The Court thus concluded that the government proved the existence of a conspiracy by a preponderance of the evidence.

■ The Court also found that the statements contained in G–17 were made by a coconspirator. Ortiz argues that the government did not establish the identity of the hearsay declarant and that, as a result, it could not show that the statements were made by a coconspirator. Although there was some conflicting testimony regarding who was responsible for record keeping generally,[8] on December 9, 1999, Diaz–Baez testified that the records contained in G–17 that implicate Ortiz were prepared by Eusebio Diaz, a/k/a Marino Diaz ("Marino"). In response to the Court's question as to who had made entries in G–17 under the heading "Chelo Debe," Diaz–Baez replied: "This is Marino. Because this was a confidential book that only Marino could touch." Tr. at 30 (Dec. 9, 1999).[9]

■ Even the government's failure to establish with certainty which coconspirator made the statements would not require their exclusion. With respect to Rule 801(d)(2)(E), the Third Circuit has stated that a declarant's " '[u]nidentifiability may be important in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence

of reliability, unidentifiability will not be particularly important.' " *United States v. McGlory,* 968 F.2d 309, 335 (3d Cir.1992) (quoting *United States v. Cruz,* 910 F.2d 1072, 1081 n. 10 (3d Cir.1990)). Other courts have also concluded that "absolute proof of authorship is not essential to the invocation of the coconspirator exception." *Id.* (citing *United States v. Helmel,* 769 F.2d 1306, 1313 (8th Cir.1985); *United States v. De Gudino,* 722 F.2d 1351, 1356 (7th Cir.1983)).

■ After the government presented evidence of the existence of a conspiracy and the fact that the notebook entries were made by a coconspirator, the Court turned to the question of whether the notebook entries were properly admitted as statements made in the course of and in furtherance of the conspiracy. The entries in G–17 were made during, and used to effect, drug transactions. The notebook contained information of use to members of the drug conspiracy in keeping track of their finances and drug deliveries–information used to further the distribution of drugs. On similar facts, other courts have found comparable statements to be "in furtherance" of a conspiracy within the meaning of Rule 801(d)(2)(E). *See, e.g., United States v. McGlory,* 968 F.2d 309, 338 (3d Cir.1992) (describing records of a drug business as "documents prepared in furtherance of the conspiracy"); *see also, e.g., United States v. Young,* 39 F.3d 1561, 1571

---

**8.** On December 8, 1999, when Assistant United States Attorney Gregory A. Paw asked Diaz–Baez who had made the entries in G–17, Diaz–Baez replied: "Well, the book that is here … first it was Marino and then Rafael Cepeda–Gisy Cepeda, she was the girlfriend of Rafael Cepeda. Gisy, her correct last name was Gisy Martinez, she was the girlfriend of Rafael Cepeda." Tr. at 16 (Dec. 8, 1999).

**9.** At trial, counsel for Ortiz objected to the admission of the records Marino created on the ground that Marino was no longer in-

volved in the conspiracy. That Marino left the conspiracy prior to the date charged on the Indictment is not relevant. As a general rule, statements made by conspirators prior to the time other members join the conspiracy are admissible against all members who subsequently join the conspiracy. *See United States v. Pungitore,* 910 F.2d 1084, 1147 (3d Cir.1990); *U.S. v. Jannotti,* 729 F.2d 213, 221 (3d Cir.1984); *see also United States v. United States Gypsum Co.,* 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); 5 Weinstein's Federal Evidence § 801.34, at 801–80 (citing cases).

(11th Cir.1994) (finding spiral notebooks containing records of drug transactions admissible under Fed.R.Evid. 801(d)(2)(E)); *United States v. Arce,* 997 F.2d 1123, 1128 (5th Cir.1993) (concluding that a coconspirator's drug ledgers were admissible under Fed.R.Evid. 801(d)(2)(E)); *United States v. Covos,* 872 F.2d 805 (8th Cir.1989) (same). In this case, as in *McGlory,* the records contained in G–17 were drug records made in the course of and in furtherance of the conspiracy charged in Count One of the Indictment and were thus properly admitted under Rule 801(d)(2)(E).

### 2. Rule 803(6)

Rule 803(6) of the Federal Rules of Evidence, the business records exception, permits the introduction of:

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid. 803(6). By its very terms, the rule authorizes the parties to offer foundation evidence from a "qualified witness" other than a record custodian. *Id.* The Third Circuit has construed the term "qualified witness" broadly, holding that "a

qualified witness only need 'have familiarity with the record-keeping system' and the ability to attest to the foundational requirements of Rule 803(6)." *United States v. Console,* 13 F.3d 641, 657 (3d Cir.1993) (quoting *United States v. Pelullo,* 964 F.2d 193, 201–02 (3d Cir.1992)). On this rationale, evidence may be admissible when the witness is not an employee of the entity; courts have even found that government agents may lay a proper foundation where the agent is familiar with the record-keeping system. *See Pelullo,* 964 F.2d at 201 (citing cases); *see also* 5 Weinstein's Federal Evidence § 803.11[11], at 803–62 (noting that the qualified witness must have familiarity with the record-keeping system, but that the "witness need not have personal knowledge of the actual creation of the document" (internal quotation omitted)).

In *United States v. Furst,* the Third Circuit set forth the elements to which a qualified witness must testify as follows:

> (1) [that] the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded the statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.

*United States v. Furst,* 886 F.2d 558, 571 (3d Cir.1989) (citing Fed.R.Evid. R. 803(6)).

 In this case, the government offered the testimony of Diaz–Baez, the supplier of narcotics to the drug organization described in the Indictment, to lay the foundation Rule 803(6) requires. Ortiz objects to the evidence on the ground that Diaz–Baez was unable to specifically identify who made the records.[10] As discussed

---

**10.** Ortiz claims that Diaz–Baez testified that one of five people could have made the note-

book entries. Based on the record, the Court concludes that this position is unfounded.

above, the Court finds this contention to be without merit. Diaz–Baez identified three people who were responsible for record keeping for the drug organization. See notes 8 and 10, *supra.* Furthermore, during both his testimony in the presence of the jury and the document voir dire concerning G–17, Diaz–Baez demonstrated that he was well-versed in the record-keeping system.[11]

Diaz–Baez testified as to the organization's record-keeping practices and that Marino had made the entry in G–17 implicating Ortiz;[12] the Court concluded at trial that the government presented evidence that (1) Marino had personal knowledge regarding the drug transactions with "Chelo" that were recorded in the notebook; (2) Marino recorded the entries at or near the time the transaction occurred; (3) Marino made the records during the regular course of business; and (4) Marino regularly kept such records in his capacity as Diaz–Baez's employee. The Court thus found at trial that the government estab-

lished all of the criteria for admissibility of business records. See *Furst,* 886 F.2d at 571. The Court remains of that opinion.

■ It is Ortiz's position that the notebook entries were tainted by a "lack of trustworthiness" and should have been excluded on this ground. See Fed.R.Evid. 803(6). Specifically, Ortiz argues that the lack of trustworthiness was demonstrated by Diaz–Baez's statements regarding an "accuracy problem" and Diaz–Baez's testimony that "his brother's name mistakenly appeared in the drug records." Def.'s Mot. to Dismiss at 20. As the Third Circuit explained in *United States v. Console,* "Rule 803(6) does not require that the person transmitting the recorded information be under a business duty to provide accurate information." 13 F.3d 641, 657 (3d Cir.1993) (internal quotation omitted). "Instead, it is sufficient if it is shown that . . . [the] standard practice was to verify the information provided. . . ." *Id.* at 658 (modification in original) (internal quotation omitted). In his testimony, Diaz–

---

During the first day of Diaz–Baez's testimony, he stated that three people were responsible for record keeping. Tr. at 16. At first, the records were kept by "Marino"; they were subsequently kept by Rafael Cepeda and Gisy Martinez. *Id.* By identifying the individuals who were responsible for record keeping and based on Diaz–Baez's personal familiarity with the record-keeping system, this case is clearly distinguishable from *United States v. Ordonez,* 722 F.2d 530 (9th Cir.1983) (finding inadmissible a drug ledger entered into evidence through the testimony of a government expert). In Ortiz's case, the government introduced evidence of who made the notebook entries; the source of the record keeper's personal knowledge; the timing of recording entries; and the organization's practice of keeping records of drug transactions.

11. Diaz–Baez answered questions at the document voir dire relating to the foundational elements of Rule 803(6) as follows:

Q Did you talk with Marino about any way that you should record payments made?

A Yes, the entire time.
Q What did you talk to him about?
A To keep a record of every person who would sell, that he would receive money from. The accounting had to be very exact. That accounts [sic] he would pass to me how much he would still owe me, how much each customer of his owed me.

. . . . .

Q What would you tell him with respect to writing information down?
A If he would receive one kilo of heroin he would write down the amount received, and the same way they were paid he would have to start deducting.
Q What specific direction did you give him about, if any, with regard to when he should make those records?
A At the same time that he would receive it.
Q Now how would he know that money was received?
A Because he would pay for the drugs. He would sell the drugs, also.
Tr. at 20–21 (Dec. 9, 1999).

12. *See supra* text accompanying note 9.

Baez demonstrated that Marino had a standard practice of personally verifying the information recorded as he purchased and sold drugs for the organization. *See, e.g.,* Tr. at 14 (Dec. 8, 1999) and Tr. at 8 (Dec. 9, 1999).

The government met its burden in establishing the four foundational requirements for the admission of evidence under Rule 803(6). Thus, the Court concludes that the statements in G–17 regarding Ortiz were properly admissible as a business record.

## C. Harmless Error Analysis

As set forth in *Government of the Virgin Islands v. Bedford,* "[u]nless 'there is a reasonable possibility that [the error] contributed to the conviction, reversal is not required.'" 671 F.2d 758, 762 (3d Cir.1982) (quoting *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972)). Error is "harmless if it is highly probable that the error did not contribute to the judgment." *U.S. v. Saada,* 212 F.3d 210, 222 (3d Cir.2000) (internal quotations omitted). This standard is met "when the court possesses a 'sure conviction' that the error did not prejudice the defendant." *Id.*

In its case against Ortiz, the government offered substantial evidence of the existence of a conspiracy, and Ortiz's membership in it, including physical evidence and no less than five witnesses who offered testimony linking him to the conspiracy. *See* notes 2 and 7, *supra.* In light of all the evidence presented at trial, the Court concludes that even if the statements in G–17 were introduced in error, the error was harmless.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendant Jose Ortiz's Motion for a New Trial.

An appropriate order follows.

*ORDER*

AND NOW, to wit, this 26th day of October, 2000, upon consideration of Defendant Jose Ortiz's Motion for New Trial (Document No. 150, filed Feb. 22, 2000), Government's Opposition to Motion of Defendant Jose Ortiz for a New Trial (Document No. 161, filed Mar. 16, 2000), and for the reasons set forth in the accompanying Memorandum, IT IS ORDERED that Defendant Jose Ortiz's Motion for New Trial is DENIED.