UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert J. STRAUSS,
Defendant-Appellant.

No. 81–5357.

United States Court of Appeals,
Eleventh Circuit.

June 11, 1982.

Paul B. Johnson, Tampa, Fla., for defendant-appellant.

Manuel Menendez, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before FAY, JOHNSON and HENDERSON, Circuit Judges.

JOHNSON, Circuit Judge:

Robert J. Strauss appeals his criminal convictions for receiving in interstate commerce motor vehicles and a boat, knowing that the goods were stolen.

## I. FACTS

Daniel Ott stole a boat and trailer in his home state of Ohio.[1] He called his friend Lester King to say that he would like to bring the boat to Florida. King offered to let Ott store the boat on his property in Florida and told Ott that he could be contacted at the home of appellant Strauss, a Florida deputy sheriff whom Ott had not yet met. Ott altered the boat's identification numbers, using tools that King had given him. An associate, James Riggleman, Sr., towed the boat to Florida with a truck Ott had stolen and whose identification numbers Ott had also altered. Riggleman stopped to register the boat, trailer, and truck in Alabama while on his way south. Ott meanwhile flew to Florida, where he was picked up at an airport by Strauss' wife.

After spending several days using the boat with Strauss, King, and Strauss' friend Don Whitmer, Ott returned to Ohio. He gave Strauss permission to use the boat during his absence, although Strauss apparently never took advantage of that permission. Strauss initially stored the boat on his property. Later he, with King, moved the boat from place to place. Strauss also sought a buyer for the boat. At one point, thinking he had found one, he had Riggleman renew the boat's Alabama registration as preparation for a sale.[2] Strauss admitted at trial that he used the truck when Ott was not present, an admission confirmed by FBI agents who saw the truck at Strauss' home on one day and observed Strauss and King using the truck when they moved the boat.

Ott's original alteration of the boat's identification numbers proved inadequate. By his next visit, Riggleman had altered them again. King showed Ott the numbers and complimented Riggleman for his fine workmanship. Strauss was present, overheard the remarks, and shook his head.

As Strauss' relationship with Ott blossomed, he told Ott that he would like to own a motor home but that he had little money and "didn't want to have any troubles with it." Ott and his associates obtained fraudulent documentation for a motor home, stole one, and altered its identification numbers. Ott then drove the home to Florida. He showed Strauss the home's options and specifications list, which stated that the home was worth $25,000, and said that Strauss could have it for $10,000. Strauss expressed concern about using the registration documents for obtaining a loan and title and for inspection. Ott assured him that the identification number had been changed and that there would be no difficulties. Although Strauss never actually bought the home, he did use it. He also paid Riggleman about $200 for the costs of registering the home in Florida under a pseudonym. Riggleman, at Strauss' request, gave as his address on the registration form apartments that Strauss owned.[3]

Strauss next began to consider whether to develop a new business with the aid of Ott's unusual skills. He asked Ott about obtaining some construction equipment, which he would buy with money loaned by his friend Whitmer. Whitmer, according to an FBI agent, recalled having Strauss seek his opinion about going into the construction business with "hot" equipment.[4] Before the sale was completed, Ott was indicted on an unrelated stolen property charge. On Strauss' inquiry, Ott assured him that Florida and Strauss were not mentioned in the indictment and that the construction

---

1. We recite the facts in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Berry*, 5 Cir., 670 F.2d 583, at 588 n.2.

2. The boat never actually was sold.

3. On one of his trips to Florida, Riggleman drove a van Ott had stolen. He was arrested while attempting to sell the van, was bailed out—possibly by Strauss, and then stayed at Strauss' home. When Strauss' home was searched, Riggleman and his son were found cowering fully clothed in showers.

4. Whitmer denied making such a statement to the agent.

equipment deal could go through. Despite the assurance, the deal never actually was completed.

The FBI had come to suspect Strauss of illegal activities and kept his property, as well as King's, under surveillance. Agents eventually obtained a search warrant. On searching Strauss' home they found in his bedroom Florida tags, registration, and a sales tax receipt for the motor home; 1979 and 1980 Alabama registration papers for the boat; and a portion of a broadcast sheet for a Chevrolet truck. The motor home was seized at his residence. The truck, with the remaining portion of the broadcast sheet inside, and the boat were seized on King's property.

Strauss was convicted on three counts for violations of 18 U.S.C.A. §§ 2313 & 2315 in receiving in interstate commerce the motor home, the boat, and the truck, knowing that the items were stolen. He raises several issues on appeal.

## II. THE TRIAL COURT'S STATEMENT ON THE ROLE OF THE GRAND JURY

Strauss' counsel at trial, ignoring a warning by the court, tried to indicate to the jury that the government, by the use of leading questions during grand jury proceedings, had tried to plant in Ott's mind suitable statements about Strauss' guilt. The court then explained to the jury the role of a grand jury. It stated that a grand jury hears testimony and returns an indictment if it finds probable cause that there has been a violation of the law, that it can hear testimony that a petit jury cannot, and that leading questions are permissible in grand jury proceedings. The court also

noted that a person indicted has the right to a presumption of innocence and must be proved guilty beyond a reasonable doubt. During its instructions to the jury, the court repeated its explanation, leaving out the statements that a grand jury can hear testimony that a petit jury cannot and that leading questions are permissible. It also stated that an indictment "constitutes no evidence whatever", that it is not to be considered as evidence, and that the jury should construe no statement by the judge to suggest an appropriate verdict.[5] Strauss argues that the court's statements went beyond those necessary to correct any actions by his counsel, that they would lead a jury to believe that it could not find the facts since the grand jury had already done so, and that they were not a sufficiently detailed explanation of the workings of the grand jury.

■■ This Circuit has not ruled on the propriety of explaining to the petit jury the role of the grand jury. Other circuits, however, have considered the matter. In *United States v. Garcia*, 562 F.2d 411, 416–17 (1977), the Seventh Circuit discussed whether a court, while explaining to the petit jury the role of an indictment, had prejudiced the defendant by its discussion of grand jury procedure. Though questioning the advisability of telling the petit jury that a grand jury could hear evidence that a petit jury could not, the court found the explanation legally correct. It held that giving the instruction was not error. The Seventh Circuit ruled similarly in an earlier case, *Brandom v. United States*, 431 F.2d 1391, 1397 (1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 & 401 U.S. 942, 91 S.Ct. 950, 28 L.Ed.2d 223 (1971), in which it

---

5. Strauss contends that when the court initially instructed the jury on the role of the grand jury it did not allow him to read and object to the instructions outside of the jury's presence. This action, he asserts, violated Fed.R.Crim.P. 30, which states that a judge should allow a party to object to an instruction outside the presence of the jury. Any error in failing to permit objection, however, would not mandate reversal absent some showing of prejudice. *United States v. Salinas*, 601 F.2d 1279, 1282–85 (5th Cir. 1979). The Court in *Salinas* did

note that there may be some uncertainty in that Circuit as to whether a defendant must show prejudice or whether a court need only entertain a considerable doubt about the existence of prejudice, but it found no reason to resolve the ambiguity on the facts of the case. We also see no reason to resolve any uncertainty. If there was any error below in failing to permit objection outside the jury's presence, we are quite certain that there was no prejudice.

approved of a district court's explanation of the limited role of a grand jury and of an indictment as a means of correcting prosecutorial misstatements concerning grand juries and indictments. Finally, the Tenth Circuit has approved of a court's statement that the indictment was merely a charge and was not evidence, despite the complaint of appellants that the explanation would lead the petit jury to believe that the grand jury already had convicted them. *United States v. Mackay*, 491 F.2d 616, 622 (10th Cir. 1973), *cert. denied*, 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 & 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974). We agree with our sister circuits that an explanation to a petit jury of the role of a grand jury need not be error. We also find no reversible error on the particular facts of this case. Strauss never contends that the information the court provided was incorrect. The court's explanation was not so exhaustive as it might have been, but it did provide a correct and, in the context of the court's instructions to the jury taken as a whole, fair and balanced description of grand jury procedures. The court also gave a more detailed explanation than was absolutely necessary to correct Strauss' counsel's actions, but the scope of the explanation of how a grand jury functions was not inappropriate in the context of a statement that leading questions are permissible under grand jury procedure.[6]

We do, however, have reservations about two of the court's statements. We share with the court in *Garcia* a concern about telling a petit jury, as the court did in this case, that a grand jury can hear evidence inadmissible before a petit jury. We also believe that it would have been better if the trial court, when it initially told the jury that a grand jury will issue an indictment if it finds probable cause for a violation of the law, had stated that an indictment is not evidence. Through the course of evidentiary objections by counsel at trial, a jury probably will, of course, become aware that there exists potential evidence that it is not permitted to hear. And the jury must implicitly realize that someone must previously have found a reason to charge the defendant with a crime. Hearing, however, that another jury had heard certain evidence inadmissible before them, had found probable cause, and had issued an indictment, might lead petit jurors to include the potential existence of incriminating but inadmissible evidence and the earlier finding of probable cause as factors when deliberating on the guilt or innocence of a defendant. Nevertheless, in the circumstances of this case there was no reversible error. The court, as noted above, in its final instructions to the jury carefully couched its explanation with assertions that Strauss was entitled to a presumption of innocence, that he must be found guilty beyond a reasonable doubt, that an indictment is not evidence and cannot be considered as evidence, and that no statement by the judge should be taken as suggesting an appropriate verdict. Those statements eliminated any damage done by asserting that a grand jury can hear evidence inadmissible before a petit jury and that the grand jury had found probable cause to believe that Strauss had committed the charged crimes.

## III. JURY INSTRUCTIONS

■ Strauss asserts that on two counts the court erred in refusing his requested instructions[7] and that it erred in refusing his requested response to a jury question. His suggested responses would have stated that, in order to be convicted, Strauss had to know at the time he received the goods that the goods were stolen and that knowl-

---

**6.** The court had prepared its instructions on grand jury procedure after counsel had earlier attempted to indicate that the absence of a judge from such proceedings meant that there was no one present to determine the propriety of the questions asked. From this attempt the court might easily have thought, and from the record apparently actually did think, that it was the intent of counsel to call into question grand jury procedure generally. The scope of the instruction appears at least in part to result from this perception of counsel's intent.

**7.** Strauss does not challenge the instruction dealing with the count on receiving the boat.

edge that the goods were stolen obtained after receiving them would be insufficient.[8]

The district court stated that an essential element of the crime was "that the defendant received the motor vehicle willfully and with knowledge that it had been stolen." When the jury inquired about whether Strauss had to know that the goods were stolen at the time he received them, the court responded by stating that the jury must find that "the defendant 'received' the items . . . with knowledge at the time of receipt that [they] had been stolen." Although the court may not have used the precise language Strauss sought, it need not do so in order for its instruction to be correct. *United States v. Bright*, 630 F.2d 804, 821 (5th Cir. 1980). The response to the jury's query contained the gist of the instruction Strauss proposed. It was designed to and did remedy any lack of clarity in the court's initial instruction. Strauss' argument fails.

## IV. ADMISSION OF COCONSPIRATORS' STATEMENTS

Strauss' next contention centers on the trial court's decision under authority of Fed.R.Evid. 801(d)(2)(E) to allow into

evidence against him the statements of alleged coconspirators Ott, Riggleman and King made during the course of and in furtherance of the conspiracy. During the government's case in chief, the court ruled that the statements were admissible because substantial evidence showed the existence of the necessary predicates for admission: that the statements were made by coconspirators, that the coconspirators were part of a conspiracy to which Strauss belonged, and that the statements were made in furtherance of the conspiracy.[9] The court reconsidered its ruling at the end of the government's case in chief and again found the statements admissible because of substantial evidence showing the existence of the predicates for admission. In its latter ruling the court erred in looking only for substantial evidence, rather than for a preponderance of the evidence.[10] We nevertheless affirm its ruling since we find a preponderance of the evidence, independent of the statements sought to be introduced, indicating the existence of a conspiracy to which Strauss belonged and in the furtherance of which the statements at issue were made.[11]

---

**8.** The government protests that it is not clear that, for conviction, Strauss must, at the time he received the vehicles and boat, have known that they were stolen. We disagree. A reasonable reading of the statute compels the conclusion that knowledge must be present at the time of receipt. The cases of the former Fifth Circuit support that conclusion. "The Dyer Act [18 U.S.C.A. §§ 2311 *et seq.*] is violated when one receives a stolen automobile with knowledge of its theft . . . ." *Pilgrim v. United States*, 266 F.2d 486, 488 (5th Cir. 1959); *see also Odom v. United States*, 377 F.2d 853, 857 (5th Cir. 1967), *cert. dismissed*, 400 U.S. 23, 91 S.Ct. 112, 27 L.Ed.2d 122 (1970).

**9.** Fed.R.Evid. 801(d)(2)(E) provides that a statement is not excludable as hearsay if made "by a coconspirator of a party during the course of and in furtherance of the conspiracy."

**10.** If a court rules on the admissibility of the statements during the government's case in chief, it uses a substantial evidence test. *United States v. James*, 590 F.2d 575, 581 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). However, if the court reconsiders its initial ruling at the end of the government's case, it must use a prepon-

derance of the evidence standard in determining whether the government has established the prerequisites for the admission of the statements. *Id.* at 582.

We note that the court here reconsidered its initial ruling on its own initiative. Reconsideration is required only if the defendant makes an appropriate motion. *United States v. Bulman*, 667 F.2d 1374, 1380 (11th Cir. 1982).

**11.** Generally a trial court's decision whether a statement offered as evidence was made by a coconspirator of a defendant during the course of and in furtherance of a conspiracy may be overturned only if clearly erroneous, *Bulman*, *supra*, 667 F.2d at 1379, but if a court errs by using an inappropriate legal standard when determining the facts, the clearly erroneous test no longer applies. *See United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977); *Kentucky Fried Chicken v. Diversified Packaging Corp.*, 549 F.2d 368, 384 (5th Cir. 1977) (civil case). Since the trial court here erred in using only a substantial evidence standard when admitting the coconspirators' statements, we review independently its findings on the existence of a conspiracy.

■ Strauss admits that the evidence does show a conspiracy between Ott and Riggleman.[12] He asserts, however, that no evidence shows that he was part of that conspiracy. He is incorrect. Strauss knew of the boat's altered identification numbers, knew of the extraordinarily low price asked for the motor home, used and stored the stolen items, sought a buyer for the boat, paid for the registration of the motor home, and possessed some registration documents for the items. These facts quite clearly demonstrate that Strauss had knowingly entered and assisted in a conspiracy for the receipt and disposition of stolen property. Strauss also contends that King's statements were inadmissible because no independent evidence showed King's membership in a conspiracy. He again overlooks several crucial facts. King knew Ott was dealing in stolen items—he gave Ott the tools to alter the boat's identification numbers, pointed out to Ott and Strauss the fine work Riggleman had done in realtering the boat's identification numbers, and assuaged Ott's concerns about Strauss' occupation by telling him at one point "not to worry about Strauss; he didn't carry his work home with him." King also provided storage space for the stolen boat and truck and helped move the goods from place to place. These facts establish King's membership in a conspiracy dealing in stolen goods.

## V. THE SEARCH WARRANT

Strauss raises several objections, none with merit, to the search warrant that justified the search of his home.

### A. Particularity of the Description of Goods

■ The court issuing the search warrant described the items sought as including a "blue and white Chevrolet Motor truck with dual rear wheels"; a "GMC mobile home"; an " 'Itasca' motor home"; related registration, ownership and identification documents and markings; and other "stolen property". Strauss contends that the description was not sufficiently precise because it included broad terms such as "stolen property" and did not give the identification or license plate numbers of the vehicles sought. He seeks to hold the issuing court to too strict a standard. A search warrant must indeed be sufficiently precise as not to permit a general search, but the test is the reasonableness of the description. Elaborate specificity is unnecessary. *See United States v. Osborne*, 630 F.2d 374, 378 (5th Cir. 1980); *United States v. Freeman*, 532 F.2d 1098, 1100 (7th Cir. 1976). In *Osborne*, the Court found sufficiently precise a description of items sought as a "money order machine" and "any other evidence" relating to a robbery. Given that holding, we believe the descriptions here easily were precise enough to prevent a general search.

### B. Probable Cause

■ For a warrant to issue there must be probable cause that an offense has been committed and that evidence exists at the place for which a warrant is sought. *Zurcher v. Stanford Daily News*, 436 U.S. 547, 558, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978). Probable cause exists if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched. *See, e.g., Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1964); *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977). A magistrate's reasonable conclusion that probable cause exists is, however, conclusive absent arbitrariness. *United States v. Long*, 674 F.2d 848, 852 (11th Cir. 1982); *United States v. Weinrich*, 586 F.2d 481, 487 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).

---

12. Strauss also never argues that the statements were not in furtherance of any conspiracy that we might find existed.

Strauss makes several arguments concerning the court's findings on probable cause. He first contends that there was no probable cause to believe the items listed in the warrant were at his home. The affidavit accompanying the warrant, however, states that the FBI had observed the stolen truck and motor home at times outside his residence. On the basis of this statement the magistrate could, without arbitrariness, find probable cause that items connected with the stolen goods or the goods themselves were at the residence.

Strauss next asserts that no information was presented that showed the reliability of the hearsay statements of a confidential informant.[13] The issue is raised often. Such statements can be credited only if there are shown some of the circumstances from which the informant drew his conclusions and if some indicia of the reliability of the informant are provided. *E.g., Spinelli v. United States*, 393 U.S. 410, 413, 89 S.Ct. 584, 587, 21 L.Ed.2d 637 (1969); *United States v. Flynn*, 664 F.2d 1296, 1301–07 (5th Cir. 1982); *United States v. Garner*, 581 F.2d 481, 484 (5th Cir. 1978). The affidavit supporting the request for a search warrant asserts that the informant based his conclusions on statements by Ott and that the informant had been reliable in the past. Those assertions provided a sufficient basis for crediting the informant's statements.

Strauss' final argument is based on a communications difficulty among FBI agents that resulted in the inclusion in the affidavit supporting the request for a warrant of certain statements incorrectly attributed to the informant. Such misstatements in the affidavit, if intentionally made or in reckless disregard of the truth, and if material, will void the warrant. *United States v. Bradsby*, 628 F.2d 901, 904 (5th Cir. 1980); *United States v. Astroff*, 578 F.2d 133, 136 (5th Cir. 1978) (en banc). Strauss asserts that the statements were reckless or intentionally made. The trial judge, after a hearing, found otherwise. His finding is of fact. We will reverse it only if clearly erroneous. *See United States v. Llinas*, 603 F.2d 506, 508 (5th Cir. 1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *cf. United States v. Character*, 568 F.2d 442, 445 (5th Cir. 1978) (noting "limited scope of review"). Having reviewed the record, we find that it supports the district court's conclusion.

## VI. SUFFICIENCY OF THE EVIDENCE

Strauss' final hope for reversal lies in our finding the evidence insufficient for his conviction. Unfortunately for him, we find it sufficient. Before we address his claims with regard to separate elements of the crimes for which Strauss was convicted, we note generally that we can find the evidence insufficient for conviction only if, looking at the evidence in the light most favorable to the government, we determine that the jury necessarily must have entertained a reasonable doubt about a defendant's guilt. *E.g., United States v. Bulman*, 667 F.2d 1374, 1377 (11th Cir. 1982).

### A. Receiving Stolen Goods

Strauss admits that he at times "possessed" the goods but argues that to receive a good means not merely to possess it. Rather, he opines, he must have apparent legal power to dispose of the good. Since there is no evidence that he appeared to have such legal power, Strauss concludes that he could not be convicted for receiving stolen goods.

Strauss' definition is far too limited. Sections 2313 and 2315 have identical language that punishes anyone who "receives, conceals, stores, barters, sells, or disposes of" stolen vehicles or goods conveyed through interstate commerce. The broad sweep of the sanctioned activities indicates that the Congress did not intend a limited, technical definition of the word "receive."

---

**13.** We assume that each of the assertions that Strauss argues we cannot credit is necessary for a finding of probable cause.

We believe that accepting a good and having either physical control of or apparent legal power over a good is sufficient to show that an individual received it. The evidence before the jury was sufficient for it to conclude beyond a reasonable doubt that Strauss had accepted the items at issue and had physical control of them.[14]

### B. Knowledge that the Goods were Stolen

Strauss next contends that no evidence shows that he knew the vehicles and truck were stolen when he received them.[15] We disagree. The unexplained possession of recently stolen goods would alone allow the inference of knowledge at the time of receipt.[16] *See, e.g., Barnes v. United States,* 412 U.S. 837, 841–47, 93 S.Ct. 2357, 2360–64, 37 L.Ed.2d 380 (1973); *United States v. Lambert,* 580 F.2d 740, 743–44 (5th Cir. 1978); *United States v. Fairchild,* 505 F.2d 1378, 1381 (5th Cir. 1975).[17] More evidence than the mere possession of recently stolen goods does, in any event, exist. Strauss knew of the altered identification numbers on the boat, of the unusual manner of obtaining title for some of the items, and of the low price for the motor home. These factors, together with the complex web of other circumstantial evidence outlined in our discussion of the facts of the case, allowed the jury to conclude that Strauss knew at the time he received the vehicles and boat that they were stolen.

### C. Interstate Character of Crime

As Strauss notes, a good that has come to rest in a state has lost its interstate character. *United States v. Tobin,* 576 F.2d 687, 691–93 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Powell v. United States,* 410 F.2d 710, 713 (5th Cir. 1969). Strauss contends that the jury could not have found that the vehicles and boat retained their interstate character. As the Court in *Tobin* noted, a jury need not find that a good has lost its interstate character merely because it has reached the state where it is sold or intended to be sold so long as the movement within the destination state can be considered a continuation of the movement that began out of state. 576 F.2d at 692; *see also Powell, supra,* 410 F.2d at 713. In this case, Strauss was involved with individuals stealing property and bringing the property to Florida for sale. Two of the items at issue, the motor home and boat, were for sale in Florida. The third item, the truck, may well have been for sale; it was at least used in transporting the boat, an item that was for sale. A jury might reasonably have concluded that the actions taken with respect to the vehicles and boat were all in continuation of their movement in interstate commerce and that therefore the items had not lost their interstate character.

We reject all Strauss' claims of error below. The judgment of the district court is AFFIRMED.

---

**14.** The court's instruction to the jury stated that "[t]o receive a stolen motor vehicle . . . or a stolen boat . . . means to acquire in the sense of physical dominion or apparent legal power to dispose of the vehicle [or boat] and in[v]isages possession or control of the vehicle knowing the vehicle or boat to have been stolen." The instruction was a correct statement of the law.

**15.** The government might have avoided any difficulty with the definition of receive and with whether Strauss knew at the time he received the vehicles and trucks that they were stolen if it had stated in its indictment that Strauss also stored or concealed the items knowing that they were stolen, since storage also is sanctioned in 18 U.S.C.A. §§ 2313 & 2315. For some unexplained reason, it did not do so.

**16.** The court instructed the jury on the permissibility of this inference.

**17.** Strauss protests that he did present an explanation for his possession of recently stolen goods. A jury can, however, determine whether a purported explanation is credible. *Lambert, supra,* 580 F.2d at 743–44; *Fairchild, supra,* 505 F.2d at 1381. Based on the evidence presented to it, a jury could easily have determined that Strauss' explanation for his possession of the recently stolen property was not credible and therefore was entitled to no weight.