**UNITED STATES of America**

v.

**CRUZ, Jose, Appellant.**

**UNITED STATES of America**

v.

**ALVERIO, Julian Miguel, Appellant.**

**Nos. 89–1563, 89–1566.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 28, 1989.

Decided July 31, 1990.

Rehearing and Rehearing In Banc Denied
in No. 89–1563 Aug. 29, 1990.

Joseph A. Torregrossa (argued), John A. Gephart, Morgan Lewis & Bockius, Philadelphia, Pa., for Jose Cruz, appellant in No. 89–1563.

Mary McNeill Zell (argued), Philadelphia, Pa., for Julian Miguel Alverio, appellant in No. 89–1566.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Ewald Zittlau (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SLOVITER and BECKER, Circuit Judges, and LIFLAND, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Jose Cruz and Julian Miguel Alverio from their convictions in the district court for the Eastern District of Pennsylvania for conspiracy to possess cocaine with intent to distribute, and conspiracy to distribute cocaine, 21 U.S.C. § 846. Cruz argues that the district court erred by denying his motion to suppress certain statements made after his arrest on the grounds that: (1) the law enforcement officers did not have probable cause to arrest him; and (2) his fifth amendment rights were violated. On the latter issue, Cruz contends that the *Miranda* warnings he was given were inadequate and that he did not waive his right to remain silent. Additionally, Cruz contends that the district court erred by allowing a United States Customs Agent to testify about a conversation he overheard between two unidentified Hispanic women because: (1) it was unreliable; (2) it was hearsay; (3) it was not relevant; and (4) it violated the defendants' sixth amendment confrontation clause rights. As will be seen, the resolution of this aspect of the appeal turns on whether the statement of the unidentified woman was admissible as a co-conspirator declaration. Alverio also submits that there was insufficient evidence to support his convic-

---

[*] Honorable John C. Lifland, United States District Judge for the District of New Jersey, sitting by designation.

tion, and that his sentence was excessive. For the reasons that follow, we will affirm.

## I. THE FACTS

The facts of the case, developed at the hearing on the defendants' motion to suppress evidence and at the trial, are largely undisputed and are as follows.

### A.

In November 1988, United States Customs Service Agent Julio M. Velez was working on a joint investigation with United States Drug Enforcement Administration (DEA) Special Agent Frank Marrero into drug activity conducted by one Rene Guzman on the 3000 block of North Leithgow Street in Philadelphia. On Friday, November 18, Velez conducted surveillance in the vicinity of 3052 North Leithgow and on at least seven separate occasions observed individuals drive up to 3052 North Leithgow, enter the building, and then exit carrying brown paper or plastic bags. Based upon Velez's experience, he believed that the individuals entering and exiting the building were engaged in drug trafficking. On November 21, from 3:00 to 4:00 p.m., Velez again established surveillance in the vicinity of 3052 North Leithgow and observed at least ten cars pull up to 3052. An individual would exit 3052, approach the cars, receive currency from the people in the cars, re-enter 3052, and then return to the cars and hand the people in the cars a plastic bag with a white substance. During the surveillance, Velez observed Rene Guzman drive up to the area, enter 3052 North Leithgow, exit the building after a few minutes and enter 3054 North Leithgow, then return to 3052 with a package, and then return to 3054.

By November 18, 1988, Velez had determined that Guzman had a prior criminal record involving arrests and a conviction for drug trafficking. Velez had also learned that Guzman had purchased a grocery store at 5100 Whitaker Avenue, Philadelphia. On that date, Velez conducted surveillance at the grocery store, and noticed a vehicle parked in the carport which was registered to Rene Guzman, of 3054 North Leithgow. On November 21, 1988, at approximately 8:00 p.m., federal search warrants were executed at 3052, 3054 and 3056 North Leithgow Street.

At approximately 10:00 p.m. that evening, while the search was underway (a process that took several hours), Velez was standing around the corner from the scene of the search, with a group of neighbors, watching the police activity. At that time, Velez observed a young Hispanic female running down the street. She spoke to another young Hispanic female in Spanish, asking for a third woman. Velez overheard the first young female excitedly state that she wanted the keys to 5100, that the police had just raided Rene's house, and that they needed the keys to the store because there were "two things" (translation) in the store. Velez immediately left the area and contacted other police units by radio to dispatch vehicles and agents to 5100 Whitaker Avenue because he believed that evidence was going to be removed from the building. Velez then drove his own unmarked car to that address.

Shortly after Velez arrived at 5100 Whitaker Avenue, he observed a tan El Camino make a U-turn on Whitaker Avenue and park on the corner opposite the store. A Hispanic male, later identified as Cruz, exited the passenger side of the El Camino, walked over towards the store, put his hand into his pocket as if he were reaching for something, but "froze" when he observed Velez in the unmarked car. Velez circled the block to avoid suspicion. When he returned to the area, he observed Cruz looking in the window of the store. When the headlights of Velez's vehicle hit Cruz, Cruz walked away from the store and got back into the El Camino, which quickly departed the scene. Velez activated his portable red overhead light and siren, and a high-speed chase ensued. After approximately a mile, the El Camino was cut off by another vehicle driven by Customs Agent William Braker. Both Alverio, the driver of the El Camino, and Cruz were removed from the vehicle.

Because he was working undercover, Velez did not carry his *Miranda* warnings card, so, from memory, he advised both Cruz and Alverio (in Spanish) of their rights to remain silent and to have counsel present during questioning. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also advised them that the court would appoint counsel for them if necessary. Velez concluded his recitation of the *Miranda* warnings by stating that if the defendants decided to answer his questions without the presence of a lawyer, they had the right to do so. Velez then asked Alverio and Cruz if they understood their rights. Alverio and Cruz responded in the affirmative. Cruz then asked Velez in Spanish what was going on. Velez responded by asking Cruz where he was coming from, and Cruz stated that he was coming from a restaurant. Cruz also stated that he lived at 3056 North Leithgow Street. Agent Braker searched the car and found a small amount of marijuana in the console.

After hearing the testimony establishing these facts, the district court denied Cruz's motion to suppress the statements he made after his arrest. Cruz, who was particularly affected by the statement that he lived at 3056 North Leithgow Street because of the evidence that the address was a location for drug trafficking, argued that the statements should be suppressed for three reasons: first, because Velez did not have grounds to stop the El Camino or grounds to arrest him; second, because the *Miranda* warnings were inadequate; and third, because he did not waive his right to remain silent. The district court concluded that there were "adequate grounds for law enforcement officers to stop the El Camino," and that, once the car was stopped, in "all functional senses" Cruz was "under arrest." Although the court did not explicitly find that Velez had probable cause to arrest Cruz, such a finding appears to be implicit in its denial of Cruz's motion to suppress. The court expressly found that the *Miranda* warnings given to Cruz were adequate and that Cruz had then waived his fifth amendment rights.

### B.

At trial, Edwin Melendez Montes, who was a codefendant on the indictment and who had been convicted in a separate trial, was a witness for the government. Melendez testified that he knew Alverio when both lived in Puerto Rico, and that after he moved to Philadelphia in November 1988, he had a chance meeting with Alverio on the street. Melendez wrote his name, address and telephone number on a piece of paper and gave it to Alverio. Melendez again met with Alverio near Alverio's home sometime after the first meeting and asked him where he could obtain cocaine. Alverio took Melendez to 3052 North Leithgow Street and introduced him to Cruz. Cruz then sold a half gram of cocaine to Melendez for twenty-five dollars in Alverio's presence. Melendez later returned to 3052 North Leithgow and eventually began selling cocaine at that location. While selling cocaine at 3052 North Leithgow, he observed Cruz selling cocaine in front of the house.

On November 21, 1988, the date the search warrants were executed at 3052, 3054 and 3056 North Leithgow Street, Melendez was selling cocaine at 3052. Approximately half an hour before he was arrested as a result of the execution of the search warrants, Melendez saw Cruz talking to Sonia Guzman, Rene's wife, in front of 3054 North Leithgow Street, where Sonia lived. Alverio and Melendez were in front of 3052 while Cruz was speaking with Sonia in front of 3054. After Cruz spoke with Sonia, Cruz and Alverio departed the area together.

At 7:05 p.m. on November 21, 1988, before the execution of the search warrants, Philadelphia Police Officer Robert Clements made an undercover purchase of cocaine from Melendez and a Paul Rivera inside 3052 North Leithgow Street. Prior to entering the building, Clements observed Rivera exit 3056 North Leithgow Street. Clements followed Rivera inside 3052 and observed Rivera deliver a package of a number of smaller bags of cocaine to Melendez there.

As a result of the search, 3052 North Leithgow Street was found to be a distribution house for cocaine, and 3056 North Leithgow Street was determined to be a packaging house for cocaine. Melendez and Rivera were found hiding in the back of 3054 North Leithgow Street. Also found inside 3054 were Rene and Sonia Guzman, $12,729 in cash, and a radio to communicate with a radio found at 3052 North Leithgow Street. According to a deed obtained from the City of Philadelphia Records Department, Rene Guzman owned 3054 North Leithgow Street.

Velez also testified at trial, and substantially repeated his testimony at the pretrial suppression hearing. He also testified that after the search warrants were executed at the North Leithgow Street location, he and other agents executed a search warrant for Guzman's grocery store at 5100 Whitaker Avenue, and found approximately one kilogram of cocaine. The district court decided not to exclude his testimony as to the conversation between the two unidentified Hispanic females because it concluded that this conversation was not hearsay but rather, was evidence of a conspiracy between Guzman and the two females. The jury returned a verdict of guilty as to both defendants. This appeal followed.

## II. PROBABLE CAUSE

We first consider Cruz's argument that the district court erred by denying his motion to suppress the statements he made after his arrest, which he maintains was illegal.[1]

■ In order for an arrest to be legal, it must be sustained by probable cause. *See Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963); *United States v. Elias,* 832 F.2d 24, 26 (3d Cir.1987). Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient in

themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *See Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2287 n. 9, 60 L.Ed.2d 824 (1979). Cruz argues that his arrest was without probable cause because the facts in his case are similar to those in the celebrated case of *Wong Sun,* in which the Supreme Court concluded that the arrest of the defendant Wong Sun was not supported by probable cause. Our scope of review is plenary. *See United States v. Belle,* 593 F.2d 487, 497 (3d Cir.) (in banc) *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979); *United States v. Thompson,* 420 F.2d 536, 540 (3d Cir.1970) (applying independent review to question of whether there was reasonable ground for believing that the arrest was warranted).

■ In *Wong Sun,* federal narcotics agents in San Francisco learned from a defendant arrested for heroin possession that he had bought the heroin from Blackie Toy, the proprietor of a laundry on Leavenworth Street. The narcotics agents thereupon visited Oyes Laundry on Leavenworth Street and told its operator, James Wah Toy, that they were federal narcotics officers. There was nothing in the record identifying James Wah Toy and Blackie Toy as the same person. Toy slammed the door on them and ran to his living quarters in the back of the store. The agents chased Toy and arrested him in his bedroom as he was reaching into his nightstand drawer. The agents did not find any weapons or contraband in either the drawer or the premises. However, they did learn from Toy that, while he did not sell heroin, he knew someone else who did.

Toy was later convicted of a narcotics offense. On appeal, the Supreme Court held that Toy's statement to the narcotics officers should not have been admitted because the narcotics officers did not have probable cause to arrest him. It noted that

---

1. Statements made to the police following an illegal arrest are subject to the exclusionary rule and may not be admitted at trial unless they are the result of an independent intervening act of free will. *See Wong Sun v. United States,* 371

U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). The government does not contend that Cruz's statements were the result of an independent intervening act of free will.

"the sparse information at the officers' command," essentially Toy's flight, did not provide them with probable cause. *See* 371 U.S. at 481, 484, 83 S.Ct. at 413, 415. The court noted that "[a] contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct [flight] which the arresting officers themselves have provoked." *Id.* at 484, 83 S.Ct. at 415.

*Wong Sun* is distinguishable. In *Wong Sun,* the only evidence that Toy had committed a crime was his flight, which the Supreme Court concluded was not enough to support a finding of probable cause. In the present case, by contrast, there were a number of other factors, in addition to Cruz's flight, that could support a belief that he had committed a crime.

Velez knew that drug trafficking was ongoing at 3052 North Leithgow Street and that this trafficking involved Rene Guzman, who Velez knew had prior arrests and a conviction for drug trafficking. Velez knew that Guzman had purchased a store at 5100 Whitaker Avenue, and three days earlier, Velez had observed an automobile registered to Guzman parked at that location. Moreover, Velez saw the young Hispanic female running and attempting to locate another female in order to obtain the key to "5100" in order to remove "two things" because the police had just raided "Rene's house."

Velez went to 5100 Whitaker Avenue to prevent the anticipated removal of evidence and observed Alverio and Cruz arrive in an El Camino. The El Camino made a quick, concerted movement—a U-turn on Whitaker Avenue—to park directly across from the store. Velez observed Cruz exit the vehicle and proceed directly to the store, reach into his pocket to retrieve something, and then stop when he noticed Velez. After circling the block, Velez observed Cruz looking in the window of the store. When Cruz again noticed Velez, he left the store and immediately re-entered the El Camino. The El Camino quickly departed the scene, and was stopped after a police chase of approximately one mile only when another police car was used to cut it off.

The issue is close, but we think that these facts are enough to constitute probable cause. In view of Cruz's directed movements toward the store, especially the U-turn and his looking in the window, coupled with his reaching into his pocket as for a key and freezing, and then the flight, we believe that a reasonable person, armed with the knowledge that Velez had about what had gone on at Leithgow Street and Guzman's relationship to 5100 Whitaker Avenue, would believe that an offense—participating in a drug conspiracy—was being committed by Cruz. Flight at the approach of law enforcement officers, when coupled with specific knowledge relating the suspect to evidence of a crime, is a proper factor to be considered in the decision to make an arrest. *See Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). We thus conclude that the district court did not err in finding that Velez had probable cause to arrest Cruz.

## III. THE FIFTH AMENDMENT ISSUES

Cruz contends that the district court erred by not suppressing his statements because they were taken in violation of his fifth amendment rights. We disagree.

### A. Adequacy of the *Miranda* Warnings

Cruz argues first that he was not adequately informed of his fifth amendment rights, as required by *Miranda.* Although not challenging the bulk of Velez's *Miranda* recitation, Cruz claims that Velez's follow-up statement, i.e., that the defendants had a right to answer questions without a lawyer present, was misleading. The district court rejected this argument, finding "no reason to believe that Messrs. Cruz and Alverio were misled as to their entitlement to be silent or to wait and consult with a lawyer or to speak as they chose." Accordingly, the district court denied Cruz's attempt to suppress the statements.

### 1. *Scope of Review*

■ The scope of our review on the question of whether a non-exact recitation of the *Miranda* warnings is sufficient to satisfy *Miranda* requirements is, surprisingly, an issue of first impression for this court. A survey of analogous cases convinces us, however, that our inquiry involves "a hybrid question of law and fact subsuming a complex of values, and as such cannot be treated as a simple question of historical fact." *United States v. Fraction*, 795 F.2d 12, 14 (3d Cir.1986) (issue of involuntariness is subject to plenary review.)

Determining whether any given explanation of rights is sufficient "requires us to 'consider legal concepts in the mix of fact and law and to exercise judgment about the values' underlying the *Miranda* rule and the fifth amendment." *United States v. Calisto*, 838 F.2d 711, 717–18 (3d Cir.1988) (quoting *United States v. Poole*, 794 F.2d 462, 465 (9th Cir.1986)) (applying plenary review to a determination of what constitutes "custodial interrogation"); *see also Ahmad v. Redman*, 782 F.2d 409, 413 (3d Cir.) ("[V]oluntariness of a defendant's waiver of *Miranda* rights is a mixed question of law and fact, subject to plenary review...."), *cert denied*, 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (1986). As the Supreme Court has observed: "Where ... the relevant legal principle can be given

meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law." *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985).[2] We believe that the relevant legal principles, i.e. whether the warnings, as given, "conveyed to [Cruz] his rights as required by *Miranda*," *California v. Prysock*, 453 U.S. 355, 361, 101 S.Ct. 2806, 2810, 69 L.Ed.2d 696 (1981) (per curiam), can be given meaning only through their application to the particular facts of this case.[3]

### 2. *Were the Warnings Misleading?*

■ In *Duckworth v. Eagan*, —— U.S. ——, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), the Supreme Court explained that *Miranda* warnings do not have to be given in the exact words that the court scribed in its landmark *Miranda* decision.[4] *Id.* at ——, 109 S.Ct. at 2880. "The prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2359, 41 L.Ed.2d 182 (1974)). The Court noted that officers in the field sometimes

**2.** We recognize that *Miller* was a habeas corpus case, not a direct appeal, but in our view, the same principles of deference apply. A federal appellate court reviewing a federal trial court has no less reason, and indeed probably more reason (given the absence of federalism concerns), to refrain from abdicating its responsibility as an "expositor of law." *See Fraction*, 795 F.2d at 14. *See also Miller*, 474 U.S. at 118, 106 S.Ct. at 454 (Rehnquist, J., dissenting).

**3.** The Supreme Court and the Seventh Circuit have, arguably, come to a similar conclusion. In *Eagan v. Duckworth*, 843 F.2d 1554 (7th Cir.1988), *rev'd* —— U.S. ——, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), the Seventh Circuit did not give any weight to the district court's opinion that the warnings, as given, "clearly manifest[ed] adherence to *Miranda*." —— U.S. at ——, 109 S.Ct. at 2878, quoting App. to Pet. for Cert. The Supreme Court proceeded to reverse the Seventh Circuit, upholding the validity of

the *Miranda* warnings as given, but neither did the Court, in any way, base its decision on principles of deference to the state or district court findings. However, given the complete absence of discussion on the issue in both courts, we decline to rest our holding on our interpretation of how we believe those courts approached the issue.

**4.** In *Miranda*, the Court instructed that a suspect must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). As we understand it, most law enforcement officials use what is virtually the exact language from *Miranda*. *See Duckworth*, —— U.S. at —— n. 4, 109 S.Ct. at 2879 n. 4.

may not have access to printed *Miranda* warnings (e.g., while working undercover) and that it is sufficient for an officer to provide the functional equivalent of the *Miranda* warnings from memory. *Id.*, 109 S.Ct. at 2879–80. We note that officers generally do not carry a *Miranda* warning card while working undercover.

In light of *Duckworth*, we believe that Velez's recitation of the rights sufficiently conveyed Cruz's rights to him. The one problematic statement, that the defendants could speak without a lawyer present if they wanted to, was not an inaccurate characterization of the defendants' rights. We do not endorse this statement for inclusion in the *Miranda* litany, but under these circumstances we do not believe that it diluted the substance of the warnings. There is nothing in this record indicating that Cruz felt intimidated by Velez's gratuitous remark. According to Velez's testimony, Cruz stated that he understood his rights.[5] Although the district court did not explicitly find that the defendants understood their rights, it apparently found Velez's testimony credible, and we accept that credibility determination as not clearly erroneous.[6] In sum, we hold that Velez's warnings "reasonably 'convey[ed] to [Cruz] his rights as required by *Miranda.*'" *Duckworth*, —— U.S. at ——, 109 S.Ct. at 2880 (quoting *California v. Prysock*, 453 U.S. 355, 361, 101 S.Ct. 2806, 2810, 69 L.Ed.2d 696 (1981) (per curiam)).

### B. Waiver of Rights

Cruz also argues that the government did not establish that he voluntarily waived his right to remain silent. The district court found, implicitly, that his waiver was voluntary.[7]

#### 1. *Scope of Review*

As with the foregoing inquiry into whether the defendants were misled with regard to their rights, we must first address our scope of review. That issue has been settled, however, by this court. In *Ahmad v. Redman*, 782 F.2d 409, 413 (3d Cir.1986), we held that "the voluntariness of a defendant's waiver is a mixed question of law and fact, subject to plenary review."[8] Thus, although the district court has already found, implicitly, that Cruz waived his rights voluntarily, we have an independent duty to make that determination ourselves.

#### 2. *Did Cruz Voluntarily Waive his Rights?*

Our review leads us to the conclusion that Cruz's relinquishment of his right to remain silent was voluntary. Velez testified that Cruz and Alverio both acknowledged that they understood their rights. He also testified that he asked them whether they waived their rights prior to any

---

**5.** We do not intimate that a defendant's subjective understanding of his or her rights controls the question of whether the warnings, as given, were misleading. Nonetheless, whether a defendant understood his rights is arguably relevant when a court is trying to determine whether plausibly equivalent warnings sufficiently convey notice of the fifth amendment rights protected in *Miranda*. The Court has made clear that the exact *Miranda* words are not necessary, but unless *Miranda* is overturned, something essentially equivalent to the familiar *Miranda* recitation must be conveyed to the suspect. In determining whether it is equivalent, we believe that a suspect's subjective opinion of what those words meant may sometimes be relevant.

**6.** We recognize that Cruz may have stated that he understood his rights without actually understanding them, or he could have said that he

understood only out of fear of what might happen to him if he did not so indicate. After having his rights administered to him he did ask "what's going on?" However, we do not think that that statement casts significant enough doubt on his affirmative statement that he understood his rights to lead us to the conclusion that the rights, as given, were misleading.

**7.** The district court's only explicit finding was that Cruz and Alverio were not misled. However, the decision to let Cruz's post-*Miranda* warning statements into evidence demonstrates the district court's view that those statements were made voluntarily.

**8.** For the reasons expressed above in note 2, we do not believe that the habeas setting in *Ahmad* distinguishes it in any way relevant for our analysis.

questioning. After that, Cruz asked what was going on and Velez asked Cruz where he lived. Cruz's response to Velez's question was particularly important because it linked Cruz to the drug activity at his home on Leithgow Street. But Cruz never indicated that he wished to remain silent on this or any issue and there is no indication that he even hesitated before answering questions.

Admittedly, Cruz did not answer affirmatively when Velez asked him if he waived his rights prior to questioning, but we do not believe the circumstances were such that we should conclude that Cruz's responses were involuntary. Once "the warning[s] [have] convey[ed] the relevant information[,] ... the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.' " *Oregon v. Elstad,* 470 U.S. 298, 311, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (pre-*Miranda* confession does not taint process so as to render inadmissible statements made after an otherwise valid post-*Miranda* waiver of the right to remain silent) (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

In coming to the conclusion that Cruz waived his right to remain silent, we are mindful that the conversation in question did not involve prolonged, post-indictment questioning. *Cf. Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (sixth amendment context); *Spano v. New York,* 360 U.S. 315, 323–24, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (1959) (fifth amendment context). This is not a case in which the police had zeroed in on Cruz and were questioning only to strengthen their case. Although, as the district court found, the "stop" was custodial and *Miranda* warnings were neces-

sary, there was still an on-going police investigation. The drugs had not even been discovered in the store when Velez started asking Cruz questions; there was no evidence, except Cruz's own suspicious conduct, which linked Cruz to the conspiracy. Although unlikely, it was conceivable, at least, that Cruz was just a passerby, looking in the store window. Thus, Velez needed to ask questions in order to see if he had the right man.

Requiring an affirmative waiver by the suspect could seriously inhibit the ability of police officers to do essential investigative work, particularly in cases like this, where the drama is still unfolding during the questioning. We have not required an affirmative *Miranda* waiver in the past, even when the suspect was already being held in a cell, *see Ahmad,* 782 F.2d at 410, 413, and, in light of the policy concerns just expressed, we do not feel compelled to impose such a requirement now. Of course, Cruz had every right not to answer Velez's questions and Velez had an affirmative obligation to inform him of that right and make sure that he understood it. But, giving "weight to the considered conclusions" of the district court, *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985),[9] we find that Cruz answered Velez's questions voluntarily. Hence, we reject Cruz's *Miranda* claim.

## IV. THE STATEMENT OF THE UNIDENTIFIED WOMAN

▪ We next consider the argument, advanced vigorously by defendants at trial as well as on appeal, that the statement of the unidentified Hispanic female should have been excluded. Velez testified that the woman "said she needed the keys to 5100 because there were two things in 5100." Velez also heard her say that "the

9. In *Miller,* notwithstanding its determination that review should be plenary, the Supreme Court held that the federal court must give "great weight to the considered conclusions of the coequal state judiciary." 474 U.S. at 112, 106 S.Ct. at 450. In direct appeal cases, the appellate court is not reviewing the conclusions

of a coequal judiciary; it is reviewing a lower court. Thus, although we find *Miller*'s call for deference instructive, it would appear that there is a somewhat less compelling need for deference to the lower court's conclusions. *See Miller,* 474 U.S. at 118–19, 106 S.Ct. at 453–54 (Rehnquist, J., dissenting).

police had just raided Rene's house." The primary question is whether the woman's statement is admissible as a co-conspirator declaration.[10] Our review is plenary.[11]

Fed.R.Evid. 801(d)(2)(E) allows into evidence out-of-court statements, offered for the truth of the matter asserted, if they are "statement[s] by a co-conspirator of a party during the course and in furtherance of the conspiracy."[12] However, "[b]efore admitting a co-conspirator's statement ... [t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party." *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). In coming to the necessary preliminary factual conclusion as to the existence of the conspiracy, the court may evaluate the "hearsay" statement itself. "Congress has decided that courts may consider hearsay in making ... factual determinations." *Id.* at 178, 107 S.Ct. at 2780. The Supreme Court has explained the reasoning behind this rule as follows:

> [I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary factfinding is not therefore required. Even if out-of-court declara-

---

10. Relying on *Carden v. Westinghouse Electric Corp.,* 850 F.2d 996 (3d Cir.1988), Cruz argues that the statement should have been excluded because the woman was unidentified. In *Carden,* we ruled that the district court should have excluded, as hearsay within hearsay, Fed.R. Evid. 805, an age discrimination plaintiff's "smoking gun" testimony that his immediate supervisor told him that "they wanted a younger person." *See id.* at 1002. We stressed that the "they," who wanted a younger person, was unknown. *See id.* Unlike the case at bar, however, the identity of that declarant was critical because without knowing who she was or when she stated that she or the company wanted someone younger, the court could not determine if the statement was made by an agent, concerning the scope of the agency, and during the agency. Without that information, the indicia of reliability embodied in the Fed.R.Evid. 801(d)(2)(D) non-hearsay definition were absent, and the statement had to be excluded.

Comparable kinds of information about the unidentified Hispanic woman in this case are unnecessary and there is no hearsay within hearsay problem. Viewing the statement of the declarant as a co-conspirator declaration, Fed. R.Evid. 801(d)(2)(E) was a sufficient basis for admitting the statement and all the district court needed to know for the conspiracy determination was that the declarant, whoever she was, was connected to Cruz and Guzman. As we explain below, the totality of the evidence suggests the necessary connection. Unidentifiability may be important in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important. *See Miller v. Keating,* 754 F.2d 507, 510 (3d Cir.1985) (Excited utterance excep-

tion, Fed.R.Evid. 803(2), without more, is insufficient indication of trustworthiness to allow into evidence statement of an unidentified eyewitness.).

11. If the district court had found, explicitly, that a conspiracy existed, that finding would be reviewable under a clearly erroneous standard. *See In Re Japanese Electronic,* 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds sub. nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Strauss,* 678 F.2d 886, 891 n. 11 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982). However, because no such finding was made, the clearly erroneous test no longer applies and the appellate court must decide whether the record supports a finding of conspiracy. *See Strauss,* 678 F.2d at 891 n. 11. *See also United States v. Ammar,* 714 F.2d 238, 247 (3d Cir.), *cert. denied sub nom. Stillman v. United States,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). We note that the failure to make the explicit finding does not render the district court ruling reversible. "[E]ven in the absence of explicit findings by the trial court [with respect to admissibility of co-conspirator statements] the necessary threshold determination is implicit in the court's decision to send the case to the jury." *Ammar,* 714 F.2d at 247 (citations omitted). Therefore, if there is sufficient evidence of a conspiracy (i.e., a preponderance), appellate courts can infer a conspiracy finding.

12. There has been no contention that, if this statement is otherwise admissible, it should be excluded because it was not made "during the course and in furtherance of the conspiracy."

tions by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case.

*Id.* 483 U.S. at 179–80, 107 S.Ct. at 2781.

In this case, the district court admitted the unidentified female's statement because it furnished evidence of a conspiracy between the women and Guzman.[13] At first blush, evidence of a conspiracy between the unidentified women and Guzman might seem irrelevant in Cruz and Alverio's trial. Guzman was not a defendant here; therefore a statement by Guzman's co-conspirator could not come into a trial in which someone else (i.e., Cruz and/or Alverio) was the defendant, unless there was also evidence linking the actual party/defendants to the same conspiracy. Upon review, *see supra* note 12, we find that the record does contain enough evidence linking Cruz and Alverio to the conspiracy, and hence we hold that the statement was properly admitted.[14]

In analyzing the evidence, it is helpful to break the conspiracy down into two groupings: the woman and Guzman, and the woman and Cruz and Alverio. If there is evidence supporting both of these conspiracies, and both conspiracies involve the same drugs, then there is evidence of one larger conspiracy involving everyone.

The connection between the woman and Guzman is evident from the text of the statement, particularly in light of the fact that it was made while the police raid was going on. The unidentified female said that the police had just raided "Rene's [Guzman's] house." The statement was made in the immediate vicinity of the house while the raid was still going on. Additionally, she stated that she needed the keys to 5100. Admittedly, Cruz and Alverio would not be implicated by these statements unless there was evidence linking them to either Rene's house or 5100. Without such evidence, these comments would have been both hearsay and irrelevant because, although they would show evidence of a conspiracy between the woman and Guzman, absent the Alverio/Cruz connection, such evidence would have nothing to do with defendants' conspiratorial activities.

However, the fact that Cruz and Alverio went to 5100 Whitaker Avenue immediately after the unidentified female made this statement, and acted so suspiciously at that location, provides evidence of the necessary Alverio/Cruz connection.[15] The woman's statement indicates that she felt that someone must get to 5100 right away, and, right away, Cruz and Alverio were there. This activity implicates them in conspiratorial involvement with the woman because it suggests that they heard or learned of the woman's statement and then responded to it. Because the woman's statement indicates that the need for the urgency at 5100 stemmed from the recent police raid of Guzman's house, Cruz and Alverio's activi-

---

**13.** The district court's actual conclusion was: I do think that it's worth reconsidering my ruling with respect to the unidentified females. That, in my judgment, the Government is now offering for an appropriate purpose. That is to say I do think that it tends to establish that at least the declarant, and perhaps the person she's talking to, is/are involved in the conspiracy with Rene, who is Guzman.

I think that the jury would well draw that inference, and that there is no [sic] reasonable ground for thinking that they were talking about the 5100 location. So I'm now going to let Mr. Zittlau introduce that testimony....

**14.** Although Alverio did not make a formal Fed. R.App.P. 28(i) motion in his brief, at oral argu-

ment, counsel for Alverio joined in Cruz's arguments with regard to the statements of the unidentified female. Thus, we analyze the admissibility of the statement for both defendants.

**15.** In this respect, this case is quite similar to *Bourjaily.* There, the coconspirator statements indicated that the party against whom they were to be admitted would be in a certain hotel's parking lot, in his car, and would accept the delivery of some cocaine. 483 U.S. at 180–181, 107 S.Ct. at 2781–82. The fact that these events later occurred was other evidence, besides the statement itself, tending to show the existence of a conspiracy between these two individuals and the court ruled that the statement was admissible.

ty also links them to Guzman and the drug activity at Guzman's house. Hence, the totality of the evidence establishes, at least by a preponderance of the evidence, the existence of a conspiracy.

■ Once that conspiracy is established, the statement can come in as the declaration of a co-conspirator, and if it can come in as the statement of a co-conspirator, there is no violation of the sixth amendment confrontation clause. *Bourjaily*, 483 U.S. at 182, 107 S.Ct. at 2782 (citing *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). We so hold. We add that defendants' claim that the statement was not relevant clearly cannot withstand the foregoing analysis. The statement was not only relevant, it was pivotal in establishing the conspiracy for which Cruz and Alverio were convicted.[16]

## V. ALVERIO'S CLAIMS

■ We turn next to Alverio's claim that there was insufficient evidence to support his conviction. In considering this claim, we must uphold the verdict of the jury if, when viewed in the light most favorable to the government, the evidence is sufficient to support the verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Leon*, 739 F.2d 885, 890–91 (3d Cir.1984).

There is evidence that Alverio took Melendez to 3052 North Leithgow Street and introduced Melendez to Cruz so that Melendez could purchase cocaine from Cruz and that Alverio remained present while Cruz sold the cocaine to Melendez. There is also evidence that after the execution of the search warrants on North Leithgow Street,

Alverio drove Cruz to 5100 Whitaker Avenue, where a kilogram of cocaine was stored, stopping directly in front of the location. Finally, there is evidence that Alverio rapidly departed the scene after Cruz, while standing in front of the store, noticed Velez in an unmarked car. Alverio did not stop when Velez attempted to stop his vehicle by using an overhead red light and siren. Indeed, he did not stop until he was cut off by another police car. We agree with the government that this is sufficient evidence to support the jury's verdict.

■ We have also considered Alverio's sentencing argument, and we find it to be without merit. His principal contention, that his role in the charged crimes was "minimal," as opposed to "minor," is essentially a factual determination and hence is subject to clearly erroneous review. *United States v. Ortiz*, 878 F.2d 125, 127 (3d Cir.1989). Given the evidence described above, the district court's finding of minor participation was not clearly erroneous.

## VI. CONCLUSION

For the foregoing reasons, the judgment of conviction will be affirmed.

---

**16.** Nor is there any basis for defendants' claim under Fed.R.Evid. 403. In light of the foregoing analysis, there was no concern that the defendants would be harmed by *unfair* prejudice.